(No. 16693.—Decree affirmed.)
LULA M. PARKER, Appellee, *vs.* DAVID N. GRAY *et al.*— (FLETA R. HUSTON *et al.* Appellants.)

*Opinion filed June 18, 1925.*

1. DOWER—*ante-nuptial agreement may be set aside under general prayer of bill for assignment of dower—equity.* Where a bill specifically prays for assignment of dower and contains a general prayer for such other and further relief as equity may require, the court is authorized, under the general prayer, to set aside an ante-nuptial agreement where it is necessarily incidental to granting the specific relief prayed and where the facts warrant it, even though the ante-nuptial agreement is not referred to in the bill.

2. HUSBAND AND WIFE—*general rule as to when ante-nuptial agreement is valid.* Where an intended wife has knowledge or reasonably ought to have had knowledge of the character and extent of her intended husband's property, an agreement executed by her releasing her right as widow in the husband's estate in consideration of covenants and agreements of the husband is valid, and the fact, alone, that the provision made for her is disproportionate to the value of the husband's estate does not render the contract voidable.

3. SAME—*when fiduciary relation affects validity of ante-nuptial agreement—burden of proof.* Where parties entering into an ante-

nuptial agreement are engaged to be married a confidential relation exists, and if the provision made for the intended wife is disproportionate to the extent and value of the husband's estate the presumption is raised of intentional concealment by the intended husband, and the burden is on those claiming the validity of the contract to prove the intended wife had full knowledge, or ought to be charged with full knowledge, of the extent of the estate.

4. SAME—*what is not sufficient to charge the intended wife with knowledge of husband's estate.* Where parties entering into an ante-nuptial agreement stand in a fiduciary relation because of an engagement to marry, the facts that the intended husband was a wealthy man and that the intended wife lived in his family five years before the contract was made are not sufficient to charge her with knowledge of the extent and value of his property, and thereby, alone, overcome the presumption that the agreement was brought about by his designed concealment of such value.

5. APPEALS AND ERRORS—*what necessary to reverse a decree as not supported by evidence.* Before a reviewing court is justified in reversing a decree on the ground that it was not warranted by the testimony the court must be able to say the decree is contrary to the manifest weight and preponderance of the evidence.

APPEAL from the Circuit Court of Macon county; the Hon. JAMES S. BALDWIN, Judge, presiding.

ALEXANDER MCINTOSH, (FANNIE A. BIVANS, of counsel,) for appellants.

WALTER H. MILLS, for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

Appellee, Lula M. Parker, filed her bill in the circuit court of Macon county at the October term, 1924, for the assignment of dower. The bill alleged she was married on October 21, 1913, to James H. Parker, who died May 8, 1924, leaving appellee, his widow, and James J. and Alice J. Parker, his children by appellee, as his sole heirs-at-law. The bill alleges Parker made a will May 5, 1919, which was duly proved and admitted to probate; that appellee renounced the will in writing and elected to take in lieu of

the provisions made for her in the will, her dower and legal share of her deceased husband's estate. The bill set out a large amount of real estate owned by Parker at the time of his death, in Macon county, DeWitt county and Brown county, and prayed that dower be assigned appellee in the lands. A copy of the will was made an exhibit to the petition. By the will the testator devised to his wife all household and kitchen furniture, an automobile, and also a quarter section of land in Macon county in fee simple and the home place in the city of Maroa, and to a niece $5000. The will devised to Fleta R. Huston a farm of 208 acres in DeWitt county on certain conditions, and to his two children, both minors, the rest of his property. The two minor children and all other necessary parties were made defendants to the bill. A guardian *ad litem* was appointed for the two children of testator and Fleta R. Huston, who were all minors. Defendants filed a joint and separate answer, setting up an ante-nuptial contract made by appellee and the testator October 21, 1913, in and by which appellee released all her right as widow in testator's estate in case she survived him, in consideration of his agreement to will her a certain 160 acres of land, the home place in Maroa, all the household and kitchen furniture, and to their children, if any survive him, all the residue of his estate except the Magill farm of 208 acres and $5000 in money. The answer averred the ante-nuptial contract was a valid and binding agreement and a bar to appellee's claim for dower. No replication or other pleading was filed. The case was referred to the master in chancery to take the testimony and report his conclusions of law and fact. After hearing the evidence the master reported it showed the testator left real and personal property in Illinois of the value of $700,000 but did not show the value of the lands he owned in the States of Kansas, South Dakota and Washington; that the value of the 160 acres of land devised appellee was $32,000; that the value of the homestead in Maroa was $7000, in addition

to the household and kitchen furniture given appellee by the will. The master found from the evidence that at the time the ante-nuptial contract was executed appellee's hearing was impaired and the evidence did not disclose whether she understood its provisions. The master further found that the provisions made for appellee in the contract were grossly disproportionate to the value of testator's estate, and the evidence failed to show appellee had full knowledge of the nature, character, extent and value of testator's property at the time the agreement was executed. He therefore recommended a decree canceling and setting aside the ante-nuptial agreement and for the assignment of dower as prayed in the bill. Objections to the report were overruled by the master, were renewed as exceptions before the chancellor and overruled. A decree was entered that appellee was entitled to dower and it appointed commissioners to assign to her the same.

Some of the facts not in dispute are, that James H. Parker had been married before his marriage to appellee. None of the children of that marriage survived. Before the death of his first wife, appellee, then an orphan girl eighteen or nineteen years of age, was employed as a servant in testator's family and lived in the family until the death of his first wife, and after her death continued as housekeeper for testator until October 21, 1913. On that date appellee and testator went to the office of an attorney, Andrew H. Mills, in the city of Decatur, who had been counsel for testator several years, and signed the ante-nuptial agreement which is set up in the answer. After the agreement was executed, and on the same day, the parties secured a marriage license and were married. They lived together until the death of Parker, May 8, 1924. Two children were born of their marriage,—James J. and Alice J.,—who still survive. After the marriage ceremony was performed Parker executed a will prepared by his attorney, Mills, in which he devised to appellee property in accord-

ance with the agreement in the ante-nuptial contract. On May 5, 1919, he executed another will, which made no substantial departure from the former will and none whatever as to the devise to appellee or their surviving children.

In the bill filed by appellee for assignment of dower no reference is made to the ante-nuptial contract, nor is it referred to in any pleading in the case except the answer of the answering defendants. The court entered a decree in accordance with the findings and recommendations of the master in chancery, and the minor defendants, by their guardian *ad litem,* have appealed.

The question of the validity of the ante-nuptial agreement, which is the sole question for decision, is presented in an unusual manner. It will be observed appellee has never questioned its validity or asked to have it set aside in any pleading in the case. She was not competent to testify as a witness in her own behalf and so did not question it in any testimony. By her bill she ignored the agreement, and without mentioning it claimed the right to dower in the real estate of which testator died seized. The contract was set up as a defense to her claim of dower by the executors and trustees under the will and by the minor defendants by their guardian *ad litem.* As it was not denied appellee signed the agreement, it was necessary to granting the relief she prayed that the agreement be declared void and set aside. Ordinarily a complainant will not be granted relief he does not ask, and appellants contend vigorously that the decree must be reversed for the reason that there is no pleading upon which to base the decree setting aside the ante-nuptial agreement. The bill specifically prays for the assignment of dower and contains a general prayer for such other and further relief as equity may require, and we are of opinion, if the facts proved warranted it, the court was authorized, under the prayer for general relief, to set aside the agreement, which was necessarily incidental to granting the specific relief prayed.

Parties having the legal capacity to contract may make a valid ante-nuptial agreement. Where the intended wife has knowledge, or reasonably ought to have had knowledge, of the character and extent of the intended husband's prop-erty, an agreement executed by the intended wife releasing her right as widow in the husband's estate in consideration of the covenants and agreements of the husband in the ante-nuptial contract will be valid; but when the parties are en-gaged to be married before the contract is entered into, a confidential relation exists, and if the provision made for the wife is disproportionate to the extent and value of the husband's estate the presumption is raised of intentional concealment by the intended husband, and the burden is on those claiming the validity of the contract to prove the intended wife had full knowledge or ought to be charged with full knowledge. (*Taylor* v. *Taylor,* 144 Ill. 436; *Achilles* v. *Achilles,* 151 id. 136; *Hessick* v. *Hessick,* 169 id. 486; *Murdock* v. *Murdock,* 219 id. 123.) The general rules announced in those cases have been repeated in many other decisions of this court. Whether a fiduciary relation existed between appellee and the testator when the contract was executed depends upon whether they had before that time entered into a marriage contract. Appellee entered the service of testator while his first wife was living, continued in the family till the first wife died, two years later, and after her death remained as testator's housekeeper for three years and until she married him, in October, 1913. The testator was then sixty-four or sixty-five years old.

M. E. Huston, one of the executors, father of Fleta R. Huston and an intimate friend of testator and many years his tenant, testified testator told him two months before he and appellee were married that they were engaged and were going to be married. The witness went with him to Decatur, at his request, the day he was married, to meet appellee, who had been visiting in the South and was to arrive in Decatur about noon. The purpose of testator's trip to

Decatur that day, October 21, 1913, was to marry appellee there.

Mrs. Nellie Huston, wife of M. E. Huston, testified testator told her prior to October 21, 1913, that he and appellee were engaged to be married. Witness went to Decatur with testator and appellee a few weeks before they were married. On their way home testator handed appellee a ring and told her to try it on. She did so and said it was too large. They turned around, went back to the jewelry store and exchanged it. It was a plain band-ring. Witness went to Decatur October 21, 1913, to be present at the marriage. Before that time appellee told witness she and testator were engaged and talked about their going to get married. She appeared worried whether it was best for her. Testator talked to witness often about his intended marriage to appellee.

Upon the above proof, which was not contradicted, the chancellor found and decreed that there existed between the parties a contract to marry when the agreement was entered into. The ante-nuptial agreement itself recites that the parties to it had mutually explained to each other the kind, amount and value of their property, respectively, and the laws of Illinois relating to the rights of husband and wife had been fully explained to them, and each of them fully understood said rights.

Attorney Andrew H. Mills, who drafted the agreement here involved, was called as a witness by appellants, and testified, in substance, that testator first spoke to him about drafting a contract, and also a will, on October 3, and witness made a draft of each. The next day testator and appellee came to witness' office and the will and contract were read to them. Witness explained the rights of husband and wife under the laws of Illinois and told them they would have to explain to each other the property each had, and they said they had done so and understood what property they had. There was no discussion or conversation in wit-

ness' office about how much property either party had.  Appellee did not ask anything about or comment upon either the contract or will.  Some changes were made, and witness saw testator several times between October 4 and 21.  On the latter date both parties came to the office about two o'clock P. M., and the revised contract was read and signed by them and they left.  Witness said the contract remained in his safe from the day it was signed till the present time; that he had not seen appellee from that date till the day of testator's funeral; that he did not know appellee was hard of hearing when she was in his office on the two occasions in October, 1913, and did not learn of her defective hearing until after testator's death.  He further testified that he did not know whether or not appellee understood what witness said to her, or what he explained to them with respect to the rights of husband and wife; that he assumed she understood about the conversation in his office until he found out, after testator's death, that she was hard of hearing; that he did not know whether appellee was able to hear and understand either the conversation he had with them or the reading of the contract and will and did not know whether she comprehended the contract or not.

The witness Huston testified appellee was unable in 1913 to hear a conversation in an ordinary tone of voice, and her hearing is still defective.  Gray, one of the executors, testified her hearing was rather seriously affected.

We have set out the substance of Mills' testimony rather fully because he was the only witness who testified to whether appellee was informed of the extent and value of testator's property before or at the time she signed the contract.  His testimony is practically of no value and proves nothing upon the question whether appellee had full knowledge of the extent and value of testator's property.  Was she at any time fully informed or are the circumstances sufficient to charge her with knowledge?  The fact that the contract recites the parties had explained to each

other the amount and value of their respective property is not of itself sufficient to prove full knowledge on her part. Neither do we think the fact that she had been a servant in testator's family five years is sufficient to charge her with full knowledge. The mere fact, alone, that the provision made for her was disproportionate to the value of testator's estate does not render the contract voidable. If she had signed it with full knowledge, however acquired, she would be bound by it. But when a confidential relation exists, the presumption arises, as we have seen, when the provision made for the intended wife is disproportionate to the husband's estate, that its extent and value were intentionally concealed, and that presumption must be overcome by proof by those who seek the benefit of the contract. The estate in Illinois of the testator was of the value of between $700,000 and $1,000,000. The provision made for appellee was approximately $40,000, which is less than one-third of what she would be entitled to under the law. The fact that testator was a wealthy man and that appellee lived in his family five years before the contract was made cannot be said to be sufficient to charge her with knowledge of the extent and value of his property, and thereby overcome the presumption that the agreement was brought about by his designed concealment of the value of his estate. *Hessick* v. *Hessick, supra; Mines* v. *Phee,* 254 Ill. 60; *Murdock* v. *Murdock, supra.*

Before a reviewing court is justified in reversing a decree on the ground that it was not warranted by the testimony the court must be able to say the decree is contrary to the manifest weight and preponderance of the evidence. We cannot say that is the state of the record in this case, and the decree is affirmed.     *Decree affirmed.*