VIOLA M. BROWN, Appellant, vs. JARVIS J. BROWN et al.
Appellees.

*Opinion filed February 24, 1928.*

1. HUSBAND AND WIFE—*general rule as to when an ante-nuptial contract will be held valid.* Where the intended wife has knowledge or reasonably ought to have knowledge of the character and extent of the intended husband's property, an ante-nuptial agreement releasing statutory rights in the intended husband's estate in consideration of covenants and agreements of the intended husband will be held valid if the parties had legal capacity to contract.

2. SAME—*when presumption arises that intended husband concealed the extent and value of his estate.* Where the parties are engaged to be married before the execution of an ante-nuptial contract a confidential relationship is deemed to exist, and if the provision made for the wife in such contract is so small as to be disproportionate to the extent and value of the intended husband's estate the presumption is raised of an intentional concealment of the extent of such estate, and the burden is on those claiming the validity of the contract to prove that the intended wife had full knowledge, or ought under all circumstances to be charged with full knowledge, of the extent of the intended husband's property.

3. SAME—*an ante-nuptial contract will be sustained if circumstances show knowledge of extent of property.* While the facts that the intended wife lived near the intended husband and that he was reputed to be wealthy are not sufficient to show knowledge of the extent of his property, the surrounding circumstances may be such as to show that the intended wife should have had knowledge of the value of the intended husband's property, and if the facts are sufficient to charge the intended wife with such knowledge, an ante-nuptial contract, even though the parties were engaged, will be valid, regardless of whether the information came from the intended husband.

4. SAME—*when ante-nuptial contract is ratified.* Acceptance of a provision for the intended wife in an ante-nuptial contract after she has acquired full knowledge of the facts, ratifies and confirms the contract.

5. EVIDENCE—*nature and effect of presumptions.* Presumptions are not evidence but arise by rule of law, and their effect is to create the necessity for evidence to meet the *prima facie* case created under the presumption, which, if no proof to the contrary is offered, will prevail.

APPEAL from the Circuit Court of Will county; the Hon. FREDERIC A. HILL, Judge, presiding.

THOMAS D. MASTERS, and WALTER T. DAY, for appellant.

IRVING SHUTTS, DONOVAN, BRAY & GRAY, and JAMES E. BURKE, guardian *ad litem,* for appellees.

Mr. JUSTICE STONE delivered the opinion of the court:

This is an appeal from a decree of the circuit court of Will county dismissing appellant's bill to set aside a certain ante-nuptial agreement and to decree that she is the owner of a one-third interest in fee in the land of her husband, Elias Brown, deceased. The bill charges that the ante-nuptial agreement was executed by her and Brown on April 29, 1914, and that they were married on April 30, 1914. By an amendment it is averred that at the time of the execution of the agreement, and for some time prior thereto, there existed between them an engagement to marry; that appellant was induced to enter into the ante-nuptial agreement to waive all further right or interest in her husband's estate for the sum of $3000; that Brown then owned certain real estate described in the bill amounting to 360 acres of farm land in Will county and was possessed of personal property to the amount of $20,000; that no disclosures were made to her by Brown as to the value of his property, and at the time of the making of the contract she was wholly ignorant of the extent of real estate and personal property owned by him; and that the contract was inequitable and unjust and unreasonably disproportionate to the means and property rights of Brown. The bill also alleges that she was deceived and imposed upon in the execution of the instrument, and that she did not at any time until the death of Brown know that the effect of the instrument was to bar her marital rights in the estate of

Brown; that the contract was fraudulent and in equity and good conscience should be set aside. The answer of Ara B., Jarvis J. and Paul Brown, adult sons of the deceased by a former marriage, denied the allegations of the bill as to the inadequacy of the consideration for the ante-nuptial contract and denied that Brown died seized of $20,000 of personal property but averred that he at the time of his death had little or no personal property. It alleges that the contract was made by appellant after full and mature deliberation and with full knowledge, notice and information as to the extent of the property of Brown; that a certain insurance policy from which the sum of $3000 was to be paid was paid by the insurance company on or about November 19, 1917, and that about that time appellant received the $3000 in accordance with the provisions of the contract and accepted it in lieu of all her marital rights in the estate of Brown. A guardian *ad litem* was appointed for Asahel T. Brown, minor son of Asahel Brown, a deceased son of Brown by a former marriage. The guardian *ad litem* filed an answer substantially in the form and substance of the answer of the adult defendants. The hearing was had before the chancellor in open court and a decree was entered dismissing the bill for want of equity. Brown was killed in an accident in 1925. He died testate.

Appellant's evidence consists of the will of Elias Brown, the inventory of his estate, the ante-nuptial contract, the certificate of marriage between the parties, a certain contract between the sons of Brown, which is not material to the consideration of this case, the records of the recorder's office tracing title to the real estate described in the bill, evidence of an engagement to marry, proof of the death of Brown in 1925, the probate of his will and the appointment of an executor, her renunciation of the will, proof of his heirs-at-law, the age of appellant, and evidence as to the market value of the real estate described. Appellant and Brown lived together as husband and wife until the

time of his death. Appellant also took the stand in rebuttal and denied certain testimony offered by appellees. Appellees offered testimony to show knowledge on the part of appellant that Brown owned the land in question, that she had received the sum of $3000 named as consideration in the contract, and that she knew the nature and character of the contract. The correctness of the chancellor's findings and decree on the evidence is the only question presented by this record.

Appellant at the time of the making of the contract was forty-two years of age and Brown was fifty-two. The evidence concerning the value of the farm land ranged from $63,000, the maximum value placed thereon by appellees' witnesses, to $90,000, the maximum value placed thereon by appellant's witnesses. The present worth of a widow's interest in such land was thus shown to be from $13,000 to $17,000. There is no evidence in the record that Brown died seized of personal property other than certain stock in elevator and grain companies, which he by his will bequeathed to appellant, certain other stocks of no value, household goods also bequeathed to appellant, a small amount of grain, and two notes of his sons for small amounts.

The evidence showed an engagement or contract of marriage existing between appellant and Elias Brown prior to the execution of the ante-nuptial agreement. A rule applicable in this class of cases and frequently applied by this court is, that where the intended wife has knowledge, or reasonably ought to have had knowledge, of the character and extent of the husband's property, an agreement executed by the intended wife releasing her right as widow in the husband's estate in consideration of the covenants and agreements of the husband in the ante-nuptial contract will be held valid if the parties have legal capacity to contract. It is also the rule that when parties are engaged or agree to be married before the execution of the ante-nuptial con-

tract a confidential relationship is deemed to exist, and if the provision made for the wife is disproportionate to the extent and value of the husband's estate the presumption is raised of an intentional concealment by the intended husband, and the burden is on those claiming the validity of the contract to prove that the intended wife had full knowledge, or ought under all the circumstances to be charged with full knowledge, of the extent of her husband's property. (*Parker* v. *Gray,* 317 Ill. 468; *Murdock* v. *Murdock,* 219 id. 123; *Hessick* v. *Hessick,* 169 id. 486; *Achilles* v. *Achilles,* 151 id. 136; *Taylor* v. *Taylor,* 144 id. 436.) This rule has also been laid down in numerous other cases. Under this rule and appellant's evidence in chief in this record she made a *prima facie* case entitling her to the relief prayed in the bill. There is no evidence of concealment on the part of Brown, and the *prima facie* case is made by the presumption provided by such rule. She was entitled to a decree unless the presumption was overcome by evidence offered by appellees. Presumptions are not evidence but arise as a rule of law. Their effect is to create the necessity for evidence to meet a *prima facie* case created under such presumption, and which, if no proof to the contrary is offered, will prevail. (*Stephens* v. *Hoffman,* 275 Ill. 497; *Helbig* v. *Citizens' Ins. Co.* 234 id. 251; *Graves* v. *Colwell,* 90 id. 612.) To overcome this presumption appellees offered the following evidence:

The witness Christ Christensen testified that he is the father of Mrs. Edward Johnson; that in the summer of 1912 she lived across the road from Elias Brown, who at that time was living on the land described in the bill; that his daughter, and his grand-daughter, Mildred Johnson, were then ill with typhoid fever; that appellant, who was a professional nurse, nursed them for a period of about seven weeks, during a large portion of which time the witness was at the Johnson home; that Brown, who lived just across the road, came over each morning to see how the

witness' daughter and grand-daughter were getting along; that on one occasion the witness stated to appellant, "There comes Mr. Brown; there is a fellow for you; he's got lots of land;" to which appellant replied that she would like to have some of the land but that she objected to certain of Brown's physical characteristics.

Anna Johnson, the daughter of Christensen, testified that Brown called at the house each day to see how they were getting on; that he frequently took appellant riding; that on one occasion appellant was sitting on the edge of Mildred's bed and said to her, "Is that all Mr. Brown's land out there?" pointing in the direction of Brown's house, to which the daughter replied "Yes, and some over there," and pointed in another direction. This witness also testified that she had pointed out to appellant the land owned by Brown and had told her that he was a very wealthy and a very good man.

Mildred Linderman testified that she is the daughter of Anna Johnson, concerning whom the latter had testified; that before marriage her name was Mildred Johnson; that in the summer of 1912 she was ill and appellant was at their home nursing her and her mother; that the witness was then thirteen years of age; that Brown frequently came to the house to inquire after the welfare of herself and her mother, and that on one occasion appellant, sitting at the side of her bed, raised her hand and pointing in the direction of Brown's land, which lay across the road, said, "Is that his land there?" to which the witness replied, "Yes; and he has some over there," and pointed to her right.

Mattie M. Sweedler testified that on one occasion, somewhere between the 16th of May and 15th of June, 1919, she met appellant in the ladies' waiting room of the First National Bank, in Joliet; that they engaged in conversation and introduced themselves; that she had not known appellant before that time; that she had seen her on different occasions since that day; that she told appellant that her

husband and Brown were acquainted; that appellant spoke of the first Mrs. Brown, who was the mother of the adult appellees in this case, and said that the children were opposed to their marriage but that they need not worry about finances, because there had already been an agreement before the marriage by which she had received a certain sum and that that was all she would ever get; that she didn't expect any more and the children need not worry about it; that Brown would get nothing from her if she became possessed of anything. This witness on cross-examination stated that she thought it strange that appellant would talk to her of such matters on their first meeting and that she remarked to her husband about it afterwards. She also testified that in the summer of 1920 the Browns were at her home for Sunday dinner, and at that time Brown and her husband talked about Brown's farms, and Brown told which of his sons were on them.

Ella Howard testified that she lived in Chicago and had lived in Ellwood; that she was a sister of the first wife of the deceased; that she visited the Browns in Ellwood about Thanksgiving week of 1917; that appellant said to her: "You know the boys say I married Mr. Brown for his money, but I signed a contract before our marriage and received all I was to have; does this look like I married him for his money?" This witness stated that she thought that appellant was in the wrong and that the boys were in the right, but that she had no personal interest in the suit.

Peter Shutts testified that he is an attorney at law practicing in Joliet and had practiced there for forty-four years; that one of counsel for appellees is his son; that they have an office together but are not partners and never have been; that he knew both Elias Brown and appellant, and that on the 29th of April, 1914, they came to his office; that as he remembered it, appellant had a copy of an agreement or a

document which they wanted him to re-draft; that he had had some business transactions with appellant but none with Brown prior to that time; that the paper was not prepared at his office, and that he did not know why the parties came to him rather than to have a re-draft of the instrument made by the party who had originally drawn it, but supposed it was at the instance of appellant; that he made a re-draft of the agreement in duplicate and it was signed by each of them there; that they seemed to have it all understood, and that the matter was placed before him in a perfunctory sort of way; that he took the acknowledgments to the signatures; that he did not explain the meaning of the contract; that both seemed to understand it and to know what they came for; that they told him of their intended marriage and that they wanted to effect an antenuptial contract; that he told them that the instrument they had was in the form usually used in such matters; that he did not consider he was acting for Brown; that neither paid him for his services, and that there was no urging or solicitation on the part of Brown to get appellant to sign the contract and she showed no reluctance. Upon cross-examination he stated that neither he nor Brown stated on that occasion what property Brown had and that witness did not know the facts as to that matter; that he had told appellant that she was being placed on a surer foundation for the future; that in so stating he was not speaking from a monetary standpoint but that he meant that she was making a great advance on her journey in life; that the matter of property or wealth of Brown was not brought up or discussed. His testimony shows that he later loaned Brown some money and took a mortgage on the land as security. He also stated that he could not remember whether he told appellant the contract was a release of dower, but his recollection was that those matters were not discussed.

Appellees also introduced and read in evidence the deposition of Eunice Woodruff, of Long Beach, California. She

testified in her deposition that she had previously lived in Joliet and knew Elias Brown but did not know appellant until she first met her in 1916, when the Browns were living in Long Beach; that they lived about a mile from her; that they visited back and forth until the time of Brown's death; that she went with appellant to look at some property which appellant afterwards bought; that it was less than a year after she met appellant; that appellant stated that she wanted to buy a place in Long Beach and that she had $3000 to put into it; that appellant bought the property, which consisted of two lots, which the witness described; that some time after the purchase of the property appellant told her that she had gotten the $3000 from Brown when they were married; that witness had asked no questions about appellant's business but that appellant had volunteered the information; that appellant did not say anything to her about the amount of Brown's property or that she inquired of the neighbors as to the same; that at one time appellant stated that she would adopt a child and take it back East to show the boys that there was an heir beside themselves, but that she did not do so. The witness stated that she had talked several times with appellant about the marriage settlement, and that appellant told her before Brown's death that $3000 was all she got under the settlement, but that she did not think it was right not to let her have any more than $3000, and she was not satisfied.

Appellees also offered a certified copy of a deed from G. H. McGuire and wife to Viola M. Brown, conveying two lots in Long Beach, California. The description in the deed was the same as that given in the deposition of Eunice Woodruff.

On rebuttal appellant categorically denied all statements made by the witnesses concerning conversations with her.

This is all the evidence in the record touching the question of appellant's knowledge or want of knowledge of the extent of the property of the deceased at the time the

contract was executed. It has been held by this court that the facts that the intended wife lived near the intended husband and that he was reputed to be wealthy are not sufficient to show knowledge of the extent of the intended husband's property or to charge her with such knowledge. (*Hessick* v. *Hessick, supra; Mines* v. *Phee,* 254 Ill. 60; *Murdock* v. *Murdock, supra.*) It has also been held that a declaration by the intended wife's family that she was to marry a rich banker is not sufficient to show such knowledge or charge her with the same. (*Warner* v. *Warner,* 235 Ill. 448.) The surrounding circumstances may be such as to show that the intended wife reasonably should have had knowledge of the value of the intended husband's property. (*Landes* v. *Landes,* 268 Ill. 11; *Yarde* v. *Yarde,* 187 id. 636.) The law does not require that the information come from the husband direct, but if the circumstances were such as to charge her with such knowledge that fact is sufficient to sustain the contract. (*Yarde* v. *Yarde, supra.*) We are of the opinion that the evidence herein recited overcomes the presumption of concealment, and fairly tends to show that appellant knew, or should reasonably have had knowledge, of the extent of Elias Brown's property.

Appellees also contend that the evidence shows that appellant ratified this contract by the acceptance of the $3000. Appellant's counsel contend that there is no evidence showing that she received the $3000. We are of the opinion, however, that her statements to the witnesses who testified, if such testimony is to be believed, together with the purchase of property in California, and the fact, conceded by appellant's counsel, that she was without means when she married Brown, tend to show the receipt by her of that sum. The only refutation of the testimony of those witnesses is appellant's categorical denial. The canceled revenue stamps on the certified copy of the deed to her introduced in evidence indicate that the price paid was $3500. Her bill

does not deny that she received the sum to be paid to her under the contract. There is no dispute in the evidence of the allegation of the answer that the insurance policy was paid in November, 1917, and that she thereupon received the amount of $3000. The rule of law governing this point is, that the wife, by accepting the provision made for her in the ante-nuptial contract with knowledge of the facts, ratifies and confirms the contract. *Landes* v. *Landes, supra; Hudnall* v. *Ham,* 172 Ill. 76; *Weaver* v. *Weaver,* 109 id. 225.

We are of the opinion that the record fully warrants the conclusion that appellant did know, or reasonably should have known, at the time she entered into the contract and at the time of the acceptance of the $3000, that Brown owned the land described. Mattie M. Sweedler, a witness for appellees, testified, as we have seen, that on one occasion in 1920, in the presence of appellant, Brown and the witness' husband talked of Brown's farms. From an examination of the entire record we are of the opinion that appellant knew, or reasonably should have known, the extent of her husband's property at the time of the making of the ante-nuptial agreement, that she accepted the benefits of that contract with such knowledge and thereby ratified the same, and that the chancellor did not err in so finding.

Counsel for appellant assert in their brief that "the cause was heard with such indifference by the chancellor as to indicate that his mind was foreclosed to any fair consideration of the legal effect of the evidence offered by appellant." Counsel for appellees call attention to various other statements of appellant's counsel charging, in effect, that the chancellor did not grant a fair consideration to the law and evidence of the case. In the examination of the entire abstract presented by appellant there is to be found no evidence that the chancellor did not grant a full and fair hearing, and counsel for appellant stepped outside the pro-

vince of their rights and duties in this case to offer such criticism.

The decree dismissing the bill for want of equity is supported by the record, and will be affirmed.

*Decree affirmed.*