BAKER v. BAKER.—142 S. W. (2d) 737.

Western Section.    April 6, 1940.

Petition for Certiorari Denied by Supreme Court, June 29, 1940.

224

Calhoun & Matthews, of Memphis, for complainant.
Canada & Russell, of Memphis, for defendant.

ANDERSON, J.   This suit was filed by Isabel C. Baker, the widow of T. H. Baker, Sr., deceased, against the executor of his estate and those interested therein as devisees and legatees.   The ultimate end

sought by the bill was to have established the complainant's right to share in the estate as a dissentient widow according to statutory provisions relating thereto rather than according to the will. As a prerequisite to this relief, it was sought to have set aside for fraud an antenuptial contract that stood in complainant's way and which was entered into by her and her husband after their engagement to marry and before the marriage was consummated; and also to have rescinded a transaction wherein according to the averments of the bill, the executor, without the knowledge or consent of complainant, deposited to her credit in a bank the sum of $1,000, representing a cash bequest made to her in the will; and taking advantage of her distressed condition and without informing her of her rights and the true condition of the estate, prevailed upon her to sign some kind of instrument in connection with the transaction, of the contents of which she was unaware.

It was alleged that upon learning of her rights she promptly returned the $1,000 or endeavored to do so by sending to the executor her check for that amount drawn on the bank in which he had deposited that sum to her credit. The bill also prayed to have the administration transferred to the Chancery Court and for certain incidental relief that we do not regard as material to any question before us at this time.

The defendants filed a joint and separate answer denying in detail the averments of the bill respecting the alleged fraud both with respect to the procurement of the antenuptial contract and the other transaction above mentioned. They averred that the deceased generously provided for the complainant by leaving her the benefits of an insurance policy whereby she will receive throughout her life the sum of $113.34 per month; and also a cash bequest of $1,000, which the complainant knowingly received from the defendant executor "in full payment of specific cash bequest" made to the complainant in the will of her deceased husband and that she executed her written receipt therefor acknowledging the payment to be for the purpose stated and the acceptance of this bequest the defendants plead "as a bar to this action" upon the theory apparently that the complainant's effort to have the antenuptial contract set aside was an essential step in connection with her dissent from her husband's will and that the acceptance mentioned amounted to an election to take under the will.

As to the effort to set aside the antenuptial contract the defendants also plead that the complainant was estopped by her laches in failing to assert her alleged rights in this connection during the lifetime of her husband.

A jury having been demanded, the case proceeded to trial and at the conclusion of the evidence the chancellor, on motion of the defendants, withdrew the issues from the jury and dismissed the bill. After an unsuccessful motion for a new trial, the complainant

appealed in error. There are numerous assignments which do not require separate treatment. Apart from the challenge to the action of the chancellor in withdrawing the issues from the jury, the principal question is with respect to the chancellor's action in excluding complainant's testimony as to certain transactions with, and statements by, her deceased husband as being forbidden by Code, section 9780, set out below.

As developed by the evidence the theory of the effort to set aside the antenuptial contract was primarily that the complainant entered into the agreement in ignorance of the fact that the deceased was a wealthy man and that since the contract was entered into subsequent to their engagement to marry there existed at the time it was made a confidential relationship between the parties and that in view of this fact good faith required that he should have made a full disclosure of his financial circumstances.

At the time of her marriage to the deceased the complainant was a widow about sixty years of age with five grown children. She met the deceased in June, 1933. He also was about sixty years of age and had grown children—three daughters and a son. The parties became engaged in September, 1933, and the marriage was consummated on December 20, 1933. They lived together until Mr. Baker's death on February 16, 1939. No children were born of this union.

The antenuptial contract was entered into on December 14, 1933, was signed by both of the parties, with a witness to their respective signatures, and was apparently prepared by a lawyer.

It may be said at once that the record discloses through correspondence of the deceased and otherwise that at the time of their engagement and prior thereto, and at the time the contract in question was entered into, the complainant had every reason to believe that the deceased was very much in love with her and very determined upon the marriage, and insofar as the present record discloses this feeling was mutual and continued thereafter.

It is a fair inference that the contract was prepared at the instance of the deceased. In any event, the complainant knew nothing about it until it was presented to her by him for her signature.

After referring to the contemplated marriage and reciting that "both are severally possessed of real estate and personal property in his and her own right and each of said parties having children by former marriages, all of said children being possessed of means of support independent of their parents," it was in substance agreed that the marriage should in no way change the legal rights of either of the parties or their children and heirs at law in the property owned by them respectively, and that neither would make any claim

of any kind whatsoever to any part or share in the real or personal property of the other.

At the time the contract was entered into, the complainant's property consisted of a house and lot in Memphis valued at about $3,000, against which there was an indebtedness, including taxes secured by liens, of about $1,700, and two lots valued at about $600. It.seems that after the marriage, in order to prevent a foreclosure, the house and lot were in some way acquired by the deceased. In any event, he owned it at the time of his death.

At the time the contract was entered into, the deceased was rated as being worth from $200,000 to $250,000 and carried $61,500 of life insurance. He owned 800 shares of stock in the Trenton Cotton Oil Company, shown to be worth at that time about $133 a share. The inventory of his estate showed assets aggregating $176,680.23 with the statement that in the making of the inventory there had been no effort to "place on the above property or establish in any way actual values thereof, etc."

The complainant testified that at the time the contract was signed she knew the deceased owned a home at 1519 Harbert Avenue and that he was interested in the "Trenton Cotton Seed Oil Company;" that she did not know the nature and extent of his interest or its value and did not know that he was a wealthy man; "I never did know what Mr. Baker was worth, not even to the day he died. I never asked him. I did not know at all;" that she had no information from any source regarding his financial worth.

At the conclusion of her examination the following occurred:

"The Court: Before you call the next witness, I would like to ask Mrs. Baker one or two questions.

"Mr. Matthews: All right.

"The Court: The Court wants to know, did it ever occur to you during the lifetime of Mr. T. H. Baker, Sr., to bring this suit to annul this marriage agreement? A. Mr. Baker told me never to speak of it to anybody, so I never told a living soul, not my sister or brother-in-law or anybody. I never said one word about this agreement to anybody, but kept it to myself from the time I signed it until he died.

"The Court: Now you said in your testimony this morning that within three years after you were married to him you found out that he owned a controlling interest in the Trenton Cotton Oil Company. Did that make you dissatisfied with the agreement that you had signed before you married him? A. Well, I did not say anything to him, but I felt it was awfully unfair.

"The Court: And yet you continued to live with him for about three years, until his death, and you said nothing about it to anybody, is that right? A. I never said anything to anybody. I did not want to speak of it.

"The Court: That's all."

In this connection it should be stated that the Mr. Calhoun referred to is a member of the bar and is a brother of the complainant's first husband. The complainant appears to have relied upon him for advice and he is one of her solicitors in this case.

Prior to the marriage, deceased had as stated, owned a home on Harbert Avenue in Memphis worth about $10,000, with furnishings worth an equal amount. After the marriage the parties lived in this residence until the husband's death.

It then developed that the deceased had for a recited consideration of $10 in cash and love and affection, conveyed the property, including the household furnishings and an automobile as well, to T. H. Baker, Jr., on December 18, 1933, two days before the marriage, but the deed to the real property was not filed for registration until March 15, 1939, about a month after the husband's death. As stated, the parties had occupied this residence and used the furnishings therein throughout their married life, and the complainant was unaware that the property had been conveyed to the son until the latter informed her of that fact after her husband's death, exhibiting a bill of sale purporting to cover the above-mentioned transfer to him of the household furnishings and automobile.

Mr. Baker's will was probated on February 24, 1939. It named his son, the defendant, T. H. Baker, Jr., executor without bond. The only provision made in the will for the complainant was a cash bequest of $1,000. However, by means of an insurance contract the deceased had provided a monthly income for her for life of $113.24. The other insurance and the balance of the estate was left largely to the deceased's children.

The complainant testified that she signed the antenuptial contract in the office of her then fiance at his direction; that she did not read it and did not know what it contained, and that no one else was present at the time it was signed; that the deceased kept the original and she was given no copy of it and did not know where the original was found.

The complainant introduced one of the parties who signed the contract as a witness. She testified that she knew nothing about the instrument and had no independent recollection of signing it or seeing either of the parties at the time; that she was then employed in the office of the Union Compress Company located on the fifth floor of the Federal Security Building at 81 Monroe; that her office was near the office of several lawyers who occasionally called her in to witness signatures to instruments; that the contract here in question bore her signature as a witness, but that she had no recollection of having signed it or the circumstances under which it was signed.

There was introduced in evidence the following instrument, dated at Memphis, Tennessee, February 24, 1939, which the plaintiff ad-

mitted bore her genuine signature: "Received of the estate of T. H. Baker by T. H. Baker, Jr., Executor, the sum of $1,000 in full payment of specific cash bequest to the undersigned in accordance with the provision of the last will and testament of T. H. Baker."

This instrument seems to have been signed on the same day that Mr. Baker, Jr., qualified as executor of his father's will and after he had deposited in a Memphis bank to the credit of the complainant and without her knowledge and consent the sum of $1,000. This was eight days after the death of the complainant's husband. While it is not very coherent, complainant undertook to testify in some detail to the circumstances under which this receipt was signed. The substance of what she said in this connection was that she never read the instrument and did not realize what it was; that she thought she was signing a bank deposit slip; that he not only never explained to her that he was the executor of the will and not only made no effort to give her any information as to the condition of the estate, but was so abusive and offensive in his attitude toward her on this occasion that she was intimidated and frightened to the extent that she was incapable of transacting business.

In this connection the complainant testified that her brother-in-law, Mr. Calhoun, was out of town at the time this transaction occurred and that upon his return about 10 days later she drew a check for the amount the executor had deposited to her credit in the bank and sent it to him.

This check was not cashed by the executor and he, through his attorneys, advised the complainant, through her attorneys, to the effect that it would not be accepted and was being held for her account.

Thereafter, the complainant dissented from the will and filed the bill in this cause.

As already stated, upon objection of the defendant, the court excluded certain testimony of the complainant with respect to statements by or transactions with her deceased husband as being within the prohibition of Code, section 9780, hereinafter quoted. Thereupon, with a view of preserving the question the parties entered into a stipulation with respect to what the complainant would have testified to had she been allowed to do so.

The stipulation is lengthy and contains much that was not within the purview of the objection. A summary will suffice to indicate the nature of the question presented. It was agreed that complainant would have testified in substance that in June, 1933, deceased proposed marriage to her and again late in the summer; that she demurred because his first wife had then been dead less than a year; that in September, 1933, he again proposed and she accepted; that later in that month he gave her a diamond engagement ring and the engagement was announced; that preparations for the approach-

ing marriage began; that nothing was said about a prenuptial agreement until on or about December 14, 1933, after deceased's return from a visit to his son in Texas; that on this occasion he said that on account of their children he thought that a property agreement should be entered into; that he represented to her that he was not a wealthy man but thought that they "would not have to be dependent on anyone else;" that he intended to "leave her" $25,000 in the form of insurance "payable to her either in a lump sum or by the month as she desired without any reservations," to the effect that upon her death the unused remainder should go to his children; that on December 14, 1933, he presented her with "what was supposed to be an agreement and asked her to sign same; that she, having great admiration, love, and affection for him and confidence in him," signed the document without reading it, "feeling that he having said he was not a wealthy man, that the Twenty or Twenty-five Thousand ($25,000.00) Dollars he had agreed to leave her, would be a satisfactory and liberal provision;" that the true value of deceased's estate was not made known to her by him or anyone else and that she was altogether ignorant thereof; and remained so until after his death; that deceased did not inform her that he had conveyed the house and lot on Harbert Avenue and the furniture to his son but always "spoke before her and led her to believe that the property was owned by him;" that deceased did not inform her that as a matter of law he could inherit no interest in her real estate unless a child was born alive of their union; and that in signing the agreement she believed and relied on the aforesaid statements and representations of the deceased.

We do not think a determination of the ultimate question presented by the present appeal would necessarily turn upon our ruling with respect to the competency of this particular evidence, yet in view of the disposition we make of the case it is proper that we pass on the question.

The Code provision (Sec. 9780) which the chancellor thought required that the defendant's objection to the offered evidence be sustained, reads as follows: "In actions or proceedings by or against executors, administrators, or guardians, in which judgments may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, intestate, or ward, unless called to testify thereto by the opposite party."

■■ The purpose of this statutory provision is said to be to prevent the surviving party from having the benefit of his own testimony, when, by the death of his adversary, his representative was deprived of the decedent's version of the transaction or the statement. McDonald v. Allen, 8 Baxt., 446; Bingham v. Lavender, 70 Tenn. (2 Lea), 48. Practically all of the states have statutes intended

to accomplish the same general purpose, but they vary considerably in material aspects and the conflict of authority with respect to the applicability and construction of such provisions is considerable, some courts holding that they should be given a strict construction against the exclusion of testimony and others the contrary. 28 R. C. L., 492, 493. The courts of this State have taken the view that our statute must be strictly construed as against the exclusion of the testimony and in favor of its admission. Hughlett v. Conner, 59 Tenn. (12 Heisk.), 83; Montague v. Thomason, 91 Tenn., 168, 18 S. W., 264; Rielly v. English, 77 Tenn. (9 Lea), 16.

Thus, it has a number of times been held that on an issue of devisavit vel non the devisees and legatees on the one hand and the heirs and distributees on the other are competent witnesses to prove the statements of the testator if they are otherwise admissible; and even a legatee who is administrator of the testator is also a competent witness on such issues. This kind of proceeding is said to be not an action by or against an executor or administrator in the sense of this statute. Beadles v. Alexander, 68 Tenn. (9 Baxt.), 604; Orr v. Cox, 71 Tenn. (3 Lea), 617; Davis v. Davis, 74 Tenn. (6 Lea), 543.

Referring to an issue of devisavit vel non, the court in Orr v. Cox, supra, at page 619, pointed out that in Beadles v. Alexander, supra "We held that an action of this character was a contest between those claiming under the will on the one side, and those claiming against it on the other, and that it does not fall within the reason or principle of the above exception," referring to the exception incorporated in Code section 9780 to the general rule with respect to the competency of witnesses.

The reason underlying these decisions is that such actions are in effect proceedings in rem in which the estate as an entity is not interested because the effect is neither to increase or diminish the assets belonging to it. See 28 R. C. L., 511.

There is a decided conflict of authority with respect to the applicability of this doctrine to statutes such as we are considering here, the majority of the courts taking the view that it does apply. See 28 R. C. L., 512, and the cases collated in the note appearing in 51 L. R. A. (N. S.), 198 et seq.

We think the rationale of the decision of our Supreme Court last above cited requires the adoption of the majority view.

Having in mind that the general purpose of the statute undoubtedly is to protect the estates of decedents from fraudulent and fictitious claims and the strict construction adopted by our court against the exclusion of the testimony, we think it a reasonable view that the statute does not contemplate a proceeding, the result of which can neither increase nor diminish the assets of the estate but concerns only the manner in which the assets will be distributed.

In such a proceeding an executor or administrator is not concerned with the merits of the claims of rival claimants in the sense that he should prefer one over the other, but is concerned only with seeing that the assets are properly distributed, either according to the will or the statute, whichever may be held to be the proper criterion. This follows from the nature of his office. See Sizer's Pritchard, sec. 31. Whether administrator or executor, he takes the legal title to the effects impressed with a trust founded upon his duty to realize upon them and pay therefrom the debts of the deceased and dispose of the surplus according to the direction of the will or the statute of distribution, and in this connection it may be observed that in the performance of this duty he is held to the same degree of fidelity and diligence required of other trustees. Pritchard on Wills and Administration, sec. 645.

So, regarding the present suit, insofar as it is one to set aside the antenuptial contract, as being analogous to a will contest in the sense that it is in reality a contest between the widow upon the one hand and the devisees and legatees under the will upon the other, notwithstanding that the executor is a party; and since there could be no judgment for or against either party that would have the effect of either increasing or diminishing the assets of the estate, we think it is not within the purview of the statute and that the chancellor was in error in taking the contrary view.

As we have already pointed out, there is substantial authority to the contrary, but we think this conclusion is more in accord with our decisions than the opposite one would be. The cases of Spurlock v. Brown, 91 Tenn., 241, 18 S. W., 868, and Ellis v. Ellis, 1 Tenn. Ch. App., 198, impliedly support the conclusion we have reached upon this phase of the case. Both were cases wherein antenuptial contracts were set aside, and while the question we have just considered seems not to have been raised in either, it is apparent that in both the complaining spouse was allowed to and did testify with respect to statements by and transactions with the deceased husband. It does not appear whether the personal representative of the husband was a party in the case of Spurlock v. Brown, but this is evident in Ellis v. Ellis. Nor is it disclosed whether in these cases the complaining party was called by the opposite party to testify, in which event the question could arise in neither. But the opinions disclose that the court in both cases considered without question evidence of the same kind that the chancellor in this case held incompetent.

This brings us to the question of whether, with or without the excluded evidence just considered, the chancellor erred in withdrawing from the jury the issue involved in the effort to set aside the antenuptial contract. We have hereinabove pointed out that, as developed by the evidence, the complainant's case in this respect

proceeds largely, if not altogether, upon the theory that upon their engagement a confidential relation arose betwen them which, in effect, placed upon the defendants the burden of showing that the deceased husband, in subsequently entering into the contract, acted in good faith with the complainant by making a full disclosure with respect to his financial circumstances.

We have already stated the evidence which we regard as material on this question. We now proceed to examine the law applicable thereto.

■ As applicable to the facts of the present case, the rule which we think is in accord with our own cases has been very well stated by the Supreme Court of Ohio in the recent case of Juhasz v. Juhasz et al., 134 Ohio St., 257, 16 N. E. (2d), 328, 331, 117 A. L. R., 993, in the following language: "The rule supported by the weight of authority may be stated thus: An engagement to marry creates a confidential relation between the contracting parties and an antenuptial contract entered into after the engagement and during its pendency must be attended by the utmost good faith; if the provision for the prospective wife is, in the light of surrounding circumstances, wholly disproportionate to the means of her future husband and to what she would receive under the law, the burden rests on those claiming the validity of the contract to show that there was a full disclosure of the nature, extent and value of the intended husband's property, or that she had full knowledge thereof without such disclosure, and that she, with this knowledge, voluntarily entered into the antenuptial settlement. Debolt v. Blackburn, 328 Ill., 420, 159 N. E., 790; Watson v. Watson, 104 Kan., 578, 180 P., 242, 182 P., 643; In re Waller's Estate, 116 Neb., 352, 217 N. W., 588; Harlin v. Harlin, 261 Ky., 414, 87 S. W. (2d), 937; Pattison v. Pattison, 129 Kan., 558, 283 P., 483; In re Flannery's Estate, 315 Pa., 576, 173 A., 303; Denison v. Dawes, 121 Me., 402, 117 A., 314; Megginson v. Megginson, 367 Ill., 168, 10 N. E. (2d), 815; In re Enyart's Estate, 100 Neb., 337, 160 N. W., 120; In re Maag's Estate, 119 Neb., 237, 228 N. W., 537."

To the foregoing authorities may be added the cases of Stratton v. Wilson, 170 Ky., 61, 185 S. W., 522, Ann. Cas., 1918B, 917; Rolfe v. Rolfe, 125 Me., 82, 130 A., 877; Potter's Ex'r v. Potter, 234 Ky., 769, 29 S. W. (2d), 15; Jones v. McGonigle, 327 Mo., 457, 37 S. W. (2d), 892, 74 A. L. R., 550; Stahl v. Stahl, 115 Neb., 882, 215 N. W., 131; Stephens v. Stephens, 181 Ky., 480, 205 S. W., 573; Brown v. Brown, 329 Ill., 198, 160 N. E., 149; Debolt v. Blackburn, 328 Ill., 420, 159 N. E., 790; Appeal of Slagle, 294 Pa., 442, 144 A., 426; In re Koeffler's Estate, 215 Wis., 115, 254 N. W., 363; Geiger v. Merle, 360 Ill., 497, 196 N. E., 497. See also, 13 R. C. L., 1034, 1035; 30 C. J., 668; Note: 16 Ann. Cas., 710.

■ It should be noted that under this rule the contract is not invalidated merely because the portion fixed for the bride is small

or disproportionate, for, if fully informed and advised, the intended wife may be entirely satisfied with the provision made for her, and, if she then voluntarily enters into the contract she is bound by its terms. Ibid.

So far as we are aware, the cases of Spurlock v. Brown and Ellis v. Ellis, supra, are the only ones in this State which have dealt with this question and both are in accord in principle with the rule as above stated.

In both the court recognized that upon the engagement a confidential relationship arose between the parties and that upon this account the intended wife had a right to presume that she would be fully informed with respect to the material facts.

In the instant case, since the parties had already become engaged to marry at the time the antenuptial contract was entered into, the consideration for the latter agreement was purely pecuniary, and we are satisfied that under the authorities above cited the burden, in the sense of going forward with the evidence, was upon the defendants to show either that there was a full disclosure of the nature, extent and value of the intended husband's property or that the complainant otherwise had full knowledge thereof, and with this knowledge voluntarily entered into the contract. We think that this is true under the facts of this case regardless of whether the testimony of the complainant with respect to the statements or transactions with the deceased which was excluded by the chancellor, is to be considered or not. See 13 R. C. L., 1033 et seq.

In connection with an argument made by the defendants on this phase of the case, it may be observed that it has been held that the fact that the intended wife knows in a general way that the husband is reputed to be wealthy is not sufficient to satisfy the requirement of a full disclosure in making antenuptial contracts. In re Enyart's Estate, 100 Neb., 337, 160 N. W., 120. And further that in negotiations for a marriage settlement the burden is not on the prospective wife to inquire as to the wealth of her intended husband, but that it is on him to inform her, especially where anything he had said or done might mislead her as to the extent of his property. Denison v. Dawes, 121 Me., 402, 117 A., 314. We think that at least this would be true where prior to negotiations there had arisen a confidential relationship between the parties by reason of the engagement to marry.

It is also proper to point out that it has been held by good authority that where at the time of executing an antenuptial agreement releasing her interest in her husband's estate the extent of his estate was concealed from her, the presumption of fraud is not overcome by the fact that the intended wife, while in company with her husband, signed a memorandum acknowledging that she was informed of the extent of his estate. See 13 R. C. L., 1035, citing In re Warner's Estate, 207 Pa., 580, 57 A., 35, 99 Am. St. Rep., 804.

In so far as the complainant's case proceeds upon the theory that she did not read the contract and was unaware of its contents, we think, under the evidence as developed so far, she must fail. If she did not read it she had a full opportunity to do so and there is nothing in the record to indicate that there was any advantage taken of her in connection with its actual execution. Hence she could not be heard to say that she did not know the contents of it. The case of Spurlock v. Brown, supra, as well as numerous others unnecessary to cite, rule this point against her under the evidence in the record before us.

With respect to the effect of the acceptance by the complainant of the $1,000 bequest and the monthly income provided by the insurance policy upon the efforts to set aside the antenuptial contract, it is sufficient to say, as pointed out in Spurlock v. Brown, that if it should be found that the contract was fraudulent in the first instance "no subsequent bounty, be it ever so munificent, could cure the infirmity of such a transaction and convert it into a binding agreement.

The defendants very earnestly contend that this phase of the complainant's cause of action is barred by her failure to sooner assert by an appropriate proceeding the claim she now makes. Their position on this phase of the controversy is stated in the brief thus:

"Mrs. Baker knew before marriage to Mr. Baker that he was a man of very substantial means. If, however, she was uninformed, as she claims, her undisputed testimony shows that she learned within one year after marriage that he was a man of very substantial means. The most extreme view adverse to the defendants is, by her own admissions that she knew three years after marriage (which was three years before Mr. Baker's death) that he was a man of very substantial means, and she considered the contract 'unfair,' but she said nothing about it to anyone prior to Mr. Baker's death.

"She has waited until Mr. Baker has been removed by death to act concerning the contract, although she had the opportunity for not less than three years before his death, and not less than five years before his death, if another part of her testimony is accepted, within which to act.

"There can not be the slightest denial that Mr. Baker and his estate have been greatly prejudiced by her delay and election to act after his death rather than to act during the years of his lifetime upon learning he was possessed of more means than she suspected before marriage."

"The principle of laches fits this complainant perfectly."

This contention is based upon that branch of the doctrine of equitable estoppel falling under the head of laches and has been thus aptly stated: "Relief is generally refused by courts of equity, because of the lapse of time, only in such cases where the loss of

evidence, death of witnesses or parties, and failure of memory resulting in the obscuration of facts to the prejudice of the defendant, render uncertain the ascertainment of truth, and make it impossible for the court to pronounce a decree with confidence. . . . The doctrine of laches in courts of equity is not an arbitrary or a technical doctrine. No hard and fast rule for its application can be formulated. But, when the court sees negligence on one side and injury therefrom on the other, it is a ground for denial of relief." Evans v. Steele, 125 Tenn., 483, 145 S. W., 162, 165. See, also, Samuel v. King, 158 Tenn., 546, 14 S. W. (2d) 963.

In this connection, the court, in Smith v. Cross, 125 Tenn., 159, 176, 140 S. W., 1060, 1065, said: "One cannot be estopped from a present assertion of his rights because he failed to assert them at some prior time when he had no knowledge of them, unless his failure to seasonably acquire such knowledge was the result of culpable negligence." See, also, Prewitt v. Bunch, 101 Tenn., 723, 740, 50 S. W., 748; Parkey v. Ramsey, 111 Tenn., 302, 308, 76 S. W., 812; 29 C. J., 1123.

The defendants also invoke the rule that has been stated thus: "Where the party defrauded discovers the fraud and remains silent under the circumstances indicating acquiescence, or where he acts in relation to the subject-matter of the contract in such a way as to imply a willingness to stand by it, he ratifies it and cannot subsequently avoid it." Pearsons v. Washington College, 130 Tenn., 601, 606, 172 S. W., 314, 316.

It is uniformly held that what will amount to a sufficient acquiescence in a particular case calling for the application of the rule must largely depend upon its own special circumstances. Ibid; also 2 Pomeroy's Equity Jurisprudence, sec. 817.

In this connection we may observe in passing that Mr. Pomeroy refers with approval to a very interesting distinction taken by courts of the highest authority between the legal significance to be attached to acquiescence occurring while the act in question is in progress and acquiescence only after the act has been completed. 2 Pomeroy's Equity Jurisprudence, sec. 965, note.

With respect to the application of the doctrine where it is relied on to bar the remedy the learned author at Section 817 of his admirable treatise points out that the acquiescence "must be voluntary, not the result of accident, nor of causes rendering it a physical, legal, or moral necessity, and it must last for an unreasonable length of time, so that it will be inequitable even the wrongdoer to enforce the peculiar remedies of equity against him, after he has been suffered to go on unmolested, and his conduct apparently acquiesced in."

The question then is whether, under the doctrine of laches or that of acquiescence as above set forth, it can be said as a

matter of law that under the particular circumstances of this case the complainant's failure to sooner assert her right, if she had one, to set aside the contract is a bar to the remedy now pursued. This was, we think, a question for the jury under either theory. The evidence does not warrant the conclusion that the complainant, prior to the death of her husband, knew the facts upon which she now bases her action, at least those with respect to the nature, extent and value of the property owned by her husband at the time the contract was entered into. At most, she knew or had reason to know that he was a man of means but we think this was not sufficient to require that she start an action. Nor do we think that it can be said as a matter of law that she was guilty of culpable negligence in failing to learn of the necessary facts, or that she acquiesced in the conduct now complained of within the meaning of the rule above stated.

The confidential relationship continued after marriage. She was at least under a moral necessity to refrain from doing anything that would disturb that relation. There could hardly be anything better calculated to bring about domestic discord than for a wife to do what the defendants in this case insist the complainant should have done. It would hardly be in keeping with sound public policy to place such a burden upon a spouse. See In re Flannery's Estate, 315 Pa., 376, 173 A., 303; and Denison v. Dawes, 121 Me., 402, 117 A., 314.

Other cases dealing with the question are collected in a note appearing in 74 A. L. R., pages 559 et seq.

Before leaving this angle of the case it is proper to notice one other matter to which the chancellor apparently attached some importance.

When the case was called for trial, the complainant made an application for a continuance on the ground of the absence of one of the parties who signed the contract as a witness. Her name was then J. Peacock, but she later became Mrs. Crisler. Upon this application being made, the defendants, rather than encounter the delay, offered to have the witness present the following morning and the case was passed until that time when defendants appear to have made good on their offer. Counsel for the complainant desired to interview the witness, whereupon, counsel for the defendants insisted that any such interview take place in his presence. Upon this situation being presented to the chancellor he ruled that if complainant would have the witness put under subpoena her counsel could interview her privately. This was done and the interview had. However, complainant closed her case without offering Mrs. Crisler as a witness.

In his opinion, delivered when sustaining the motion to withdraw the issues from the jury, the chancellor, after reciting the facts,

said: "The Court is of opinion that rule of Fisher v. [Travelers'] Insurance Company is applicable to the proof in this case in that the witness Mrs. Crisler, formerly Miss Peacock, was not used by the complainant, and therefore the Court must indulge in the presumption that if Mrs. Crisler had been put on the witness stand here her testimony would have contradicted or failed to corroborate the testimony of the complainant herself."

The case referred to by the chancellor is that of Fisher v. Travelers' Ins. Co., 124 Tenn., 450, 138 S. W., 316, Ann. Cas. 1912D, 1246, and the ruling therein which the chancellor manifestly had in mind is to the effect that where a party to litigation is shown to be in control and possession of competent and material evidence which he has withheld, the presumption will be indulged, in the absence of an adequate explanation, that if it had been adduced such evidence would operate to his prejudice. See, also, Standard Oil Co. v. State, 117 Tenn., 618, 100 S. W., 705, 10 L. R. A. (N. S.), 1015; and Western Union Tel. Co. v. Lamb, 140 Tenn., 107, 203 S. W., 752.

The rule generally finds application in those cases where a party himself fails to adduce material facts shown to be in his possession or under his control.

Under proper circumstances the inference may be drawn from the failure to offer as a witness another who is available and shown to know material facts. 1 Wigmore on Evidence, sec. 286. Generally, however, the inference is not proper where the testimony of the possible witness is merely cumulative. Ibid., sec. 287. As pointed out in the case of Carter v. Chambers, 79 Ala., 223, 224, 231, a contrary view would require of a litigant that he should produce all of the witnesses, no matter how numerous they might be, who know anything about the transaction.

. In the instant case the only showing made with respect to what Mrs. Crisler knew about the controversy is that she signed the contract as a witness to the signatures of the respective parties. This was not an issue because the complainant admitted her signature on the contract and, moreover, she offered as a witness the other party who had signed in the same capacity that Mrs. Crisler had.

There was nothing whatever to show that Mrs. Crisler had any knowledge or information with respect to whether the deceased had acted in good faith with complainant in the respect hereinabove referred to, or with respect to the circumstances under which the contract was made. Hence, no unfavorable inference as to these vital matters was proper from the failure to introduce her as a witness. See Weeks v. McNulty, 101 Tenn., 495, 509, 48 S. W., 809, 43 L. R. A., 185, 70 Am. St. Rep., 693.

If any inference at all was to be drawn from that circumstance it was only with respect to the fact that the complainant had signed

the contract or acknowledged her signature thereon, and since the complainant admitted that and also offered the other subscribing witness thereto, the inference was of no value.

We, think, therefore, that under the circumstances of this case, if, in reaching his conclusion, the chancellor was influenced by the failure of the complainant to introduce Mrs. Crisler as her witness, he erred.

The bill sought to have set aside the receipt executed by the complainant for the payment alleged to have been made to her covering the cash bequest of $1,000. Such relief would hardly be determinative. Complainant signed the receipt, and to set it aside would serve no purpose. It is an evidentiary matter bearing upon the question of whether she elected to take under the will.

The defendants' contention on this phase of the case is stated in the brief thus: "We insist that Mrs. Baker, as a condition precedent to her right to dissent from the will, is under the imperative duty to surrender the insurance benefits which she refuses to do. Furthermore, she knowingly and freely accepted the $1000.00 cash bequest 8 days after her husband's death, under the circumstances described, which constituted an approval of the will by her."

As to the annuity provided by the insurance policy, it is sufficient to say that this did not come to the complainant by the will but by the insurance contract. Hence, the acceptance of this benefit and the refusal to surrender the right to it cannot be construed as an election to take under the will. The case of Gamble v. Fulton, 166 Tenn., 66, 59 S. W. (2d), 504, to which we are referred by the defendant, is not in point because there the provision for the insurance benefits was made in the will, which provided that she should receive nothing else from the estate. It was accordingly held that she could not dissent for the purpose of claiming dower and homestead, the court saying, "There can be no question but that the widow herein was put to an election between the homestead and the testamentary provision in her favor."

The alleged acceptance of the $1,000 cash bequest presents a different question, the answer to which turns upon whether the receipt of the bequest under the circumstances hereinabove stated amounted to an irrevocable election on the part of the complainant to take under the will.

Upon this point the defendants refer us to the case of Everett v. Mickler, 6 Tenn. Civ App. (Higgins), 590, for the rule to the effect that "it is against equity and intolerable for anyone to claim under and against a will, and that this rule simply enjoins honesty and fair dealing." No fault is to be found with this statement as an academic proposition but it contemplates a situation where one has understandingly received and retained a legacy under circumstances that would estop him from claiming against the will.

Thus, in the case cited, referring to the decision in Holt v. Rice, 54 N. H., 398, 20 Am. Rep., 138, it is said: "It is true that the right of a beneficiary under a will to return a legacy and institute a contest is recognized; and as for that matter this would doubtless be held to be the rule in Tennessee under certain circumstances, such as acceptance under a mistake or because of importunity or imposition."

The rule contended for by the defendants is announced and applied by the court to a legatee who had accepted a valuable bequest and held it for herself with actual or constructive knowledge of all the facts upon which it was sought to repudiate the will and without fraud or imposition on the part of anyone.

It does not apply where the acquiescence in the will is due to ignorance of essential facts on the part of the acquiescing legatee or devisee. See Hays v. Bright, 58 Tenn. (11 Heisk.), 325; Eddy v. Eddy, 6 Cir., 168 F., 590.

Pertinent also in this connection is the following from Spurlock v. Brown, supra [91 Tenn., 241, 18 S. W., 873]: "A widow, ignorant of her legal rights, yielded to an administrator property which was exempt. This course, through Chief Justice Nicholson, held that she acted in ignorance of her own rights under the law as widow, and that it was the administrator's duty to communicate to her what her rights were."

The ruling in these cases and others of a similar nature are based upon the proposition that, under the circumstances stated, with respect to a widow an executor occupies the relation of a trustee and must deal with her in the utmost good faith, which, in turn, requires that he disclose to her material facts within his knowledge whenever her interest is to be affected by a transaction with him. As Mr. Pomeroy so clearly points out, whenever such a duty exists concealment becomes fraudulent in law and furnishes the basis for equitable relief. 2 Pomeroy's Equity Jurisprudence, sec. 902.

We have set out the evidence bearing upon this question and without reviewing it, it is sufficient to say that we are satisfied that it cannot be said as a matter of law that there was an irrevokable election on the part of the complainant to take under the will. In this connection, it may be observed that, apart from his attitude in general, there is no explanation whatever as to why the executor resorted to what was, to say the least of it, the very unusual method of payment by opening an account with the complainant in a bank and depositing the legacy to her credit, all without her knowledge and consent. It is, of course, entirely possible that there was a reasonable explanation for this that will be made at the proper time. We say merely that, unexplained, it was a circumstance which the jury might have looked to in arriving at a

conclusion with respect to the attitude of the executor toward the widow and in determining whether he was acting in good faith with her. They might have reached the conclusion that he had some purpose of his own to serve in presenting her with what appeared to be a fait accompli.

This disposes of all the questions that have been argued and our conclusion is that those herein discussed should have been submitted to the jury. Whether the incidental relief prayed for by the bill will be granted depends on how these issues are answered upon another trial which is ordered. It is proper to say that we do not wish to be understood as intimating any opinion as to what the decision on these questions should be. We have been concerned only with the question of law as to whether the issues should have gone to the jury and for the purpose only of deciding that question, have accepted the evidence of the complainant as true. The merits of the case we have not considered.

The result is that the decree is reversed and the case remanded for a new trial upon all material issues. The defendants will pay the costs of the appeal. The other costs will abide the event.

Ketchum, J., and Adams, Special Judge, concur.