# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 30, 2012

## IN RE: ESTATE OF DANNY W. WILSON, DECEASED

**Direct Appeal from the Probate Court for Lauderdale County**
**No. JJ270     Rachel Jackson, Judge**

**No. W2012-01390-COA-R3-CV - Filed January 30, 2013**

Claimant filed a claim against the estate of his first cousin, seeking repayment of $47,300 in loans he made to the Decedent in the months before his death. The trial court sustained the claim, and the administrator of the estate appeals. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Probate Court Affirmed**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

J. Thomas Caldwell, Ripley, Tennessee, for the appellant, Barbara Wilson

Taylor D. Forrester, Knoxville, Tennessee, for the appellee, Albert J. Wilson

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Danny W. Wilson ("Decedent") died from cancer on April 23, 2011, at the age of fifty-one. Decedent died intestate, and his only heir at law was his spouse, Barbara Herron Wilson ("Mrs. Wilson"), whom he had married only two months before his death. On June 1, 2011, Mrs. Wilson filed a petition to be appointed as administrator of Decedent's estate, and the probate court entered an order appointing her as such.

On June 14, 2011, Decedent's first cousin, Albert Wilson ("Albert")[1], filed a claim against Decedent's estate. Albert claimed that the estate owed him $47,300 for loans he had made to Decedent, and he attached to his claim five checks he had written to Decedent between June 2010 and March 2011, prior to Decedent's death in April 2011. Three of the checks listed Decedent as the payee and contained a notation on the "memo" line that stated "Loan." Of these three checks, one was written in June 2010 for $800, the second was written in August 2010 for $40,000, and the third was written in March 2011 for $5,000. A fourth check, which also listed Decedent as the payee, was written by Albert in March 2011 for $500, but it did not contain a notation as to its purpose. The fifth check attached to Albert's claim was written by him in February 2011 for $1,000, and it listed the payee as Decedent's wife, Mrs. Wilson. The notation on this check stated, "Cash for [Decedent]."[2] The sum total of these five checks equaled $47,300, the amount of Albert's claim against the estate. Albert's claim included a sworn statement that it was "a correct, just and valid obligation of the estate of the decedent" and that Albert had not "received payment therefor."

Mrs. Wilson, as personal representative of Decedent's estate, filed an exception to Albert's claim, asserting that the estate did not owe Albert "any money whatever," and asking that the claim be dismissed.

The trial court held a hearing on the matter. Albert, who was fifty-one years old, testified that he and Decedent were first cousins, but that they were "raised up from probably

---

[1] Because several parties involved in this matter share the last name Wilson, we will refer to Decedent's cousin Albert Wilson as "Albert" rather than "Mr. Wilson."

[2] Inexplicably, the record before us contains one copy of the February 16, 2011 check with a memo notation stating, "Cash for Danny," and another copy of the same check with a memo notation simply stating, "Cash." Similarly, the record contains one copy of the June 25, 2010 check with a memo notation stating "Loan" beside the words "Camping Vacation," and another copy with a memo notation simply stating "Loan." There was no explanation for, or even mention of, this discrepancy during the hearing below, and the parties do not mention it in their briefs on appeal.

about three years of age like brothers." Albert described his relationship with Decedent as "very very close" and said that the two were involved in each other's lives throughout childhood and adulthood. Albert and Decedent also worked together at the U.S. Army Corps of Engineers in Memphis. Albert said the basis of his claim against the estate was that Decedent had borrowed money from him, as evidenced by the checks he submitted to the court. Albert testified that four of the checks were written directly to Decedent, and the other check was written to Mrs. Wilson rather than Decedent because, at the time, Decedent was in the hospital "with tubes running in his chest." Albert testified that these were loans that he expected to be repaid, and that he had not been repaid.

Counsel for the Decedent's estate began his cross-examination of Albert by suggesting that Albert had been repaid for the loans by virtue of the fact that Albert was designated as the beneficiary of the Decedent's life insurance policy, and it was undisputed that he had received more than $47,300 in that capacity following Decedent's death. At that point, Albert's attorney raised an objection to "any testimony from [Albert] in regards to relation of this life insurance or the intention thereof," on the basis that such testimony would be a "clear violation of the Dead Man's Statute." The trial court sustained the objection, but granted permission to the estate to make an offer of proof. In order to develop the offer of proof, counsel for the estate questioned Albert at length about the life insurance and other related matters. Albert acknowledged that he was named the beneficiary of Decedent's life insurance policy. However, according to Albert, he did not know about the beneficiary designation at the time of the loans. He said, "Just a week or two before [Decedent] died he told me I was the beneficiary." Albert said, "He made me the beneficiary to pay his funeral expenses." According to Albert, he did not know the amount of the life insurance policy at the time, because the Decedent simply said he had the "basic," and Albert understood that to mean a $10,000 policy. After the payment of funeral expenses, Albert eventually received $47,445 from the life insurance proceeds. He explained that the money he received from the life insurance policy was not to repay the debt he was owed, stating, "[Decedent] wanted me to have that plus my money that he owed me, and he wanted me to make sure that the creditors got their moneys."

Albert acknowledged that Decedent also deeded a lot and improvements to him before he died.[3] This property was encumbered, in connection with a loan obtained by Decedent's

_____

[3] When the focus of the questioning turned from life insurance to the conveyance of the lot, opposing counsel inquired as to whether counsel for the estate was still making an offer of proof. The trial judge asked for clarification as well. Counsel for the estate then stated, "I thought I asked the Court a few minutes ago I was going to direct testimony that was not under just an offer of proof [sic]." The trial judge said, "All right," and opposing counsel said, "That's fine." From our review of the transcript, we cannot discern an earlier point at which counsel for the estate ended his offer of proof. However, this issue does

(continued...)

former girlfriend, for which Decedent had pledged the property as collateral. Albert estimated that both the value of the property and the indebtedness against it were around "twenty something thousand dollars." Albert conceded, though, that the combined value of the lot and the life insurance proceeds exceeded $47,300. Nevertheless, he continued to insist that he was entitled to repayment from the estate, stating, "that's what he wanted. Because Danny told me I was going to get my money back."

Albert was the only witness to testify regarding his claim against the estate. At the conclusion of his testimony, the trial judge stated that she was sustaining Albert's claim because there was no evidence that the life insurance proceeds were intended as a repayment of the Decedent's obligation to him. Accordingly, the trial court entered an order sustaining Albert's claim in the amount of $47,300. The estate filed a motion to alter or amend, again asserting that Albert had been repaid through his receipt of the life insurance proceeds and/or the lot. The trial court denied the motion to alter or amend, stating that the record did not support the contention that the conveyance of the lot was intended to extinguish or reduce the debt owed to Albert. The estate timely filed a notice of appeal.

## II.  ISSUES PRESENTED

On appeal, the estate lists one issue for review: "Whether the trial court erred in sustaining Albert Wilson's claim against the Estate?" In his posture as appellee, Albert also presents issues for review, which we combine and summarize as follows:

> Whether the trial court correctly sustained Albert's claim because there was no competent evidence that either the Decedent or Albert intended that the life insurance beneficiary designation or the conveyance of the lot would be in lieu of his right to repayment of the debt.

Albert also argues that we should dismiss the estate's appeal because of the estate's "failure to raise or describe any issues for this Court's review with any specificity in the 'Issues for Review' of [its] brief as required by Rule 27(a) of the Tennessee Rules of Appellate Procedure." For the following reasons, we decline to dismiss the instant appeal and we affirm the decision of the trial court.

---

[3](...continued)
not meaningfully impact our review on appeal, for reasons that will be discussed hereinafter.

### III. STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2012); ***Bogan v. Bogan***, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. ***Watson v. Watson***, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). "When issues of credibility and weight of testimony are involved, we afford considerable deference to the trial court's findings of fact." ***Larsen-Ball v. Ball***, 301 S.W.3d 228, 235 (Tenn. 2010) (citing *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007)). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

### IV. DISCUSSION

#### A. The Estate's Brief on Appeal

We begin by considering Albert's assertion that this appeal should be dismissed because the estate presented a "vague issue" for review on appeal. Again, the estate's brief framed the issue as "Whether the trial court erred in sustaining Albert Wilson's claim against the Estate?" In the argument section of its brief, the estate basically contended that Albert was fully repaid either by the life insurance proceeds or by the conveyance of the lot, and that forcing the estate to pay him $47,300 would amount to a double recovery and unjust enrichment. The estate also cited some law regarding the Dead Man's Statute, Tenn. Code Ann. § 24-1-203, although it did not explain how the quoted principles apply to the facts of this case.

Our Supreme Court recently addressed the importance of framing issues on appeal:

> The outcome of a case is influenced, at least in part, by how the court approaches the issues presented. *See* Bryan A. Garner, *The Deep Issue: A New Approach to Framing Legal Questions*, 5 Scribes J. Legal Writing 1, 9 (1994–1995); [Robert J. Martineau, *Appellate Practice and Procedure* 779, 821 (2d ed.1987)]. Almost seventy years ago, Justice Felix Frankfurter observed that "[i]n law ... the right answer usually depends on putting the right question." *Rogers' Estate v. Helvering*, 320 U.S. 410, 413, 64 S.Ct. 172, 88 L.Ed. 134 (1943). Thus, a properly framed issue may be the most important

part of an appellate brief. Antonin Scalia & Bryan A. Garner, *Making Your Case: The Art of Persuading Judges* 83 (2008); David E. Sorkin, *Make Issue Statements Work for You*, 83 Ill. B.J. 39, 39 (Jan. 1995).

Rather than searching for hidden questions, appellate courts prefer to know immediately what questions they are supposed to answer. Bryan A. Garner, *Garner on Language and Writing* 115 (2009); Robert L. Stern, *Appellate Practice in the United States* § 10.9, at 263 (2d ed.1989). Accordingly, "[a]n effectively crafted issue statement will define the question to be considered and begin disposing the court to decide in the client's favor." Judith D. Fischer, *Got Issues? An Empirical Study About Framing Them*, 6 J. Ass'n Legal Writing Directors 1, 25 (2009); *see also State v. Williams*, 914 S.W.2d 940, 948 (Tenn. Crim. App. 1995) (stating that "[e]ach issue should ... relate the conclusion that the party wants the appellate court to reach"); Karl N. Llewellyn, *A Lecture on Appellate Advocacy*, 29 U. Chi. L.Rev. 627, 630 (1962) (stating that "the first thing that comes up is the issue and the first art is the framing of the issue so that if your framing is accepted the case comes out your way").

Appellate review is generally limited to the issues that have been presented for review. Tenn. R. App. P. 13(b); *State v. Bledsoe*, 226 S.W.3d 349, 353 (Tenn. 2007). Accordingly, the Advisory Commission on the Rules of Practice and Procedure has emphasized that briefs should "be oriented toward a statement of the issues presented in a case and the arguments in support thereof." Tenn. R. App. P. 27, advisory comm'n cmt. Appellants . . . must include in their . . . brief a statement of the issues they desire to present to the court and an argument with respect to each of the issues presented. <u>The issues should be framed as specifically as the nature of the error will permit in order to avoid any potential risk of waiver.</u> *Fahey v. Eldridge*, 46 S.W.3d 138, 143-44 (Tenn. 2001); *State v. Williams*, 914 S.W.2d at 948.

. . . [A]n issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn. R. App. P. 27(a)(4). *See ABN AMRO Mortg. Grp., Inc. v. Southern Sec. Fed. Credit Union*, 372 S.W.3d 121, 132 (Tenn. Ct. App. 2011); *Childress v. Union Realty Co.*, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002).

***Craig v. Hodge***, 382 S.W.3d 325 (Tenn. 2012) (footnotes omitted) (emphasis ours). In the case before us, the issue presented in the estate's brief is certainly *not* "framed as specifically as the nature of the error [would] permit." *See **id.*** Nevertheless, we are able to discern the

estate's basic contention that Albert's claim should not have been sustained because he has already been repaid. Exercising our discretion, we will also address the applicability of the Dead Man's Statute to this matter, as it was discussed in both parties' briefs on appeal, and it played a central role in the trial court proceedings. *Compare* **Word v. Word**, 937 S.W.2d 931, 932 (Tenn. Ct. App. 1996) (exercising our discretion to consider issues raised in an appellant's brief even though it did not include a statement of the issues presented for review).

## B.    The Dead Man's Statute

Tennessee Code Annotated section 24-1-203 is commonly known as the Dead Man's Statute. It provides, in pertinent part:

> In actions or proceedings by or against executors, administrators, or guardians, in which judgments may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, intestate, or ward, unless called to testify thereto by the opposite party.

Tenn. Code Ann. § 24-1-203. The Dead Man's Statute is intended "'to prevent the surviving party from having the benefit of his own testimony, when, by the death of his adversary, his representative was deprived of his executor's version of the transaction or statement.'" **Holliman v. McGrew**, 343 S.W.3d 68, 72-73 (Tenn. Ct. App. 2009) (quoting *McDonald v. Allen*, 67 Tenn. 446, 448 (1874)). The purpose of the Dead Man's Statute is "to protect decedents' estates from fraudulent or fictitious claims." **Boote v. Shivers**, 198 S.W.3d 732, 743-44 (Tenn. Ct. App. 2005) (citing *Watts v. Rayman*, 62 Tenn. App. 333, 337, 462 S.W.2d 520, 522 (1970); *Baker v. Baker*, 24 Tenn. App. 220, 231, 142 S.W.2d 737, 744 (1940)). "However, the Tennessee Supreme Court has repeatedly instructed that it must be construed narrowly in favor of the admission rather than the exclusion of evidence." **Id.** at 744 (citing *Newman v. Tipton*, 191 Tenn. 461, 465, 234 S.W.2d 994, 996 (1950); *Grange Warehouse Ass'n v. Owen*, 86 Tenn. 355, 365, 7 S.W. 457, 460 (1888)).

Here, it is not the Decedent's estate that is seeking to take advantage of the Dead Man's Statute; it is the party who had discussions with the Decedent prior to his death. The estate sought to question Albert about his conversations with the Decedent, and specifically, whether he and the Decedent had agreed that the loans would be repaid with the life insurance proceeds. It was counsel for Albert who objected to the testimony and basically claimed that Albert could not be forced to testify about such matters. The trial court erroneously sustained this objection. The Dead Man's Statute clearly provides that "[i]n actions or proceedings by or against executors, administrators, or guardians, in which

judgments may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, intestate, or ward, *unless called to testify thereto by the opposite party*." (Emphasis added). In the case at bar, Albert was essentially "called to testify" about these matters by the Decedent's estate. Under these circumstances, the Dead Man's Statute did not preclude Albert from testifying as to his conversations with the Decedent.

We were faced with a similar situation in ***Holliman v. McGrew***, 343 S.W.3d 68, 72-74 (Tenn. Ct. App. 2009). In that case, plaintiffs challenged the admissibility of their own testimony because it concerned conversations with the decedent. *Id.* at 72. We found their testimony admissible because "the Plaintiffs were asked to testify about their conversations with the Decedent by the Defendants – the opposite party." *Id.* at 74. We explained, "The [Dead Man's] statute aims to protect representatives from attacks by other parties; it does not permit representatives to avoid the consequences of their own damaging testimony." *Id.*

For these reasons, we find that the trial court erred in ruling that the estate's counsel could not question Albert about the life insurance matter. However, "[a]n erroneous exclusion of evidence requires reversal only if the evidence would have affected the outcome of the trial had it been admitted." ***Davidson v. Davidson***, No. M2001-01830-COA-R3-CV, 2002 WL 31769205, at *5 (Tenn. Ct. App. Dec. 11, 2002). Fortunately, the trial court permitted counsel for the estate to make an offer of proof. As such, we can review Albert's excluded testimony regarding the life insurance in order to determine whether it supported the estate's theory that the loans to Albert have been fully repaid.

### C.    *Repayment*

It was undisputed that Albert wrote five checks either directly to Decedent, or in one instance, for his benefit, in the months before his death. Those five checks totaled $47,300. Three of the checks contained the word "Loan" in the notation. Albert testified that these were loans that he expected to be repaid, and that he had not been repaid. Albert said he did not know that he was named the beneficiary of Decedent's life insurance policy at the time of the loans, and when he learned of the beneficiary designation "[j]ust a week or two before [Decedent] died," he still did not know the amount of the policy. He testified unequivocally that Decedent "made me the beneficiary to pay his funeral expenses." After the payment of funeral expenses, Albert received a check in the amount of $47,445 for the excess funds. However, Albert claimed that the life insurance proceeds did not repay the $47,300 debt he was owed, stating, "[Decedent] wanted me to have that plus my money that he owed me, and he wanted me to make sure that the creditors got their moneys." Albert also acknowledged that Decedent deeded an encumbered lot and improvements to him before he died. But again, he continued to insist that he was entitled to repayment of the loans from the estate,

stating, "that's what he wanted. Because Danny told me I was going to get my money back."

The trial judge sustained Albert's claim because she found no evidence that the life insurance proceeds were intended as a repayment of the Decedent's obligation to him. She likewise concluded that the record did not support the estate's contention that the conveyance of the lot was intended to extinguish or reduce the debt. We find no error in these conclusions. The basic premise of the estate's position would require us to assume or infer an agreement between the Decedent and Albert, whereby the loans would be repaid by either the life insurance proceeds or the conveyance of the lot. There simply is no evidence in the record to support such a finding, and in fact, the undisputed evidence is to the contrary. Albert clearly testified that these were loans that he expected to be repaid, and according to his testimony, there was no intention on the part of either party that the debt would be forgiven in connection with the life insurance or the lot. The estate has failed to point us to evidence in the record that would compel a contrary conclusion.[4] Based on the evidence presented, there was no agreement that the life insurance proceeds or the conveyance of the lot would serve as repayment of the loans.

## V. CONCLUSION

For the aforementioned reasons, we find no reversible error in the trial court's decision to sustain Albert's claim against the estate for $47,300, and it is hereby affirmed. Costs of this appeal are taxed to the appellant, Barbara Herron Wilson, as personal representative of the estate of Danny W. Wilson, and her surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.

---

[4] Although the trial court did not make an explicit finding regarding Albert's credibility, we believe the court's ruling implies that the court found him to be credible. "When the resolution of the issues in a case depends upon the truthfulness of witnesses, the fact-finder, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *Mach. Sales Co., Inc. v. Diamondcut Forestry Prods., LLC*, 102 S.W.3d 638, 643 (Tenn. Ct. App. 2002).