### In re The ESTATE OF Mary Reeves DAVIS.

Court of Appeals of Tennessee, Middle Section, at Nashville.

June 29, 2006 Session.

Aug. 7, 2006.

Permission to Appeal Denied by Supreme Court Dec. 27, 2006.

Gregory H. Oakley, Nashville, Tennessee, for the Appellant W. Terry Davis.

R. Horton Frank, III, and Julie Hamner Johnston, Nashville, Tennessee, for the Appellees Vergie Reeves Thomas, Louis Reeves McNeese, Joe Lynn Reeves, and Linda Reeves Elliott.

Ames Davis, Nashville, Tennessee, for the Appellee Ames Davis, Administrator C.T.A. of the Estate of Mary Reeves Davis.

## OPINION

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.

W. Terry Davis ("Husband") and Mary Reeves Davis ("Wife") were married in May of 1969. Two days before the marriage, Husband was asked to sign an antenuptial agreement, which he signed the following day. Husband and Wife remained married for over thirty years until Wife's death in 1999. When Wife's will was admitted to probate, Husband filed a petition for an elective share of Wife's estate plus one year's support. Various heirs and the Administrator of the Estate responded to the petition, claiming the antenuptial agreement prohibited Husband from electing against the will. The Trial Court found that the heirs and the Administrator had proven by a preponderance of the evidence that the antenuptial agreement was enforceable because Wife had made a full and fair disclosure of her assets prior to entering into the agreement. Husband appeals, and we reverse.

### Background

The appeal involves the validity of an antenuptial agreement entered into thirty years before Wife's death. In May of 1969, Husband and Wife were married after an eight week courtship. Two days

before the wedding, Husband was told that he needed to sign an antenuptial agreement (the "Agreement"). The Agreement was signed by Husband the next day at the office of Wife's attorney. Husband was not represented by an attorney. Husband and Wife remained married for approximately thirty years and were still married when Wife passed away in 1999.

The Agreement provides, in relevant part, as follows [1]:

WHEREAS, the parties hereto contemplate a marriage with each other at an early date and are desirous of entering into this contract and agreement for the purpose of insuring harmony in their relations and freedom of action, one from another, in the management of their business after said marriage; and

WHEREAS, each of said parties are seized and possessed of valuable property, real and/or personal, and have individual rights and each have an earning capacity and each of said parties is desirous of retaining absolute and full control of their said property, including any additions thereto, during the term of their marriage and of relinquishing all rights of every kind or character whether marital or by virtue of the statutes of descent and distribution or whether by dower or curtesy in the properties of the other; and

WHEREAS, the parties have attached hereto a general statement of their respective financial conditions and assets which do not purport to be all inclusive, the values set forth on which do not purport to be necessarily accurate but rather are estimates, and, whereas, the parties would have entered into this agreement whether the said statements accurately reflect all assets or properly reflect the true value of the assets and each party recognizes that there may be other assets or other property values but would have entered into this agreement regardless of the same.

NOW, THEREFORE, in consideration of said marriage and of the mutual covenants between the said parties herein contained and the sum of One Dollar ($1.00), each to the other paid, receipt of which is hereby acknowledged, the said Party of the Second Part does hereby release, renounce and relinquish all claims of curtesy, inheritance, descent and distribution in and to the real or personal property of the said Party of the First Part now owned or hereafter acquired and to any other right or claim in or to the estate of the said Party of the First Part which may arise in any manner or accrue by virtue of said marriage; and the said Party of the First Part for the consideration aforesaid does hereby release, remise and relinquish all rights of dower or inheritance and all rights under the statutes of descent and distribution, year's support or otherwise in all property, real or personal, of the said Party of the Second Part now owned or hereafter acquired and all other rights or claims in and to the estate of said Party of the Second Part which may in any manner arise or accrue by virtue of said marriage.

It is understood, however, that in the event either party should by last will and testament make any provision for the other party, such release shall not constitute a release of a claim to such devise or bequest contained in any valid will....

1. The Agreement refers to Wife as the "Party of the First Part," and Husband as the "Party of the Second Part."

Even though the Agreement indicates that each of the parties to that Agreement was attaching a "general statement of their respective financial conditions," apparently no one was able to locate such an attachment of Wife's assets. The Agreement was introduced as an exhibit at trial, but there were no lists attached to it.

Wife's first husband was the famed country music singer Jim Reeves, who tragically died in an airplane crash in 1964. When Jim Reeves died, Wife inherited various business ventures and real property from Jim Reeves' estate. Just prior to Wife's marriage five years later to Husband, Wife's assets were worth roughly four million dollars, and Wife's annual income from investments and businesses, etc., was approximately $300,000 to $400,000.[2] When Wife died after approximately thirty years of marriage to Husband, she left Husband $100,000 in her will. Wife's will was prepared in 1976.

After Wife's will was admitted to probate, Husband filed a "Petition for Elective Share, Year's Support, Homestead and Exempt Property." Certain other heirs under the will as well as the Administrator of the Estate responded to the petition, claiming the Agreement barred Husband from electing to take against the will. The issues surrounding the validity of the Agreement were severed from all other estate and probate issues, and in October of 2001 the Trial Court conducted a hearing pertaining solely to whether the Agreement was enforceable.

The first witness was Joyce Jackson ("Jackson"). Jackson testified that she moved to Nashville in 1958 and shortly thereafter began working for Jim Reeves Enterprises. Jackson worked for Jim Reeves as a personal secretary. After Mr. Reeves died in 1964, Jackson continued to work for Jim Reeves Enterprises, which was operated by Wife after Mr. Reeves' death. Jackson continued to work for Jim Reeves Enterprises until 1988.

Jackson first met Husband in 1969, when Husband approached Wife about her purchasing real estate in the Bahamas. A few weeks later, Wife told Jackson that she and Husband were planning on getting married. Jackson testified that prior to the marriage of Husband and Wife, she was approached by Wife about typing an antenuptial agreement. Jackson stated that she typed a draft of the Agreement and both Husband and Wife then gave her a list of assets to be typed. Jackson typed the separate lists of assets. According to Jackson:

> As best I remember, Mary gave me a list that she had written out of her assets and they included her home, her business, which was Jim Reeves Enterprises, which housed her—the affiliated companies, her cars that she had at the time, some other real property, some jewelry, and basically that's about all I can recall. . . .

When asked if the list contained the monetary value of the assets, Jackson stated "[n]ot that I remember. I don't remember anything having a set value to it." When asked if she did not remember there being any values or whether there in fact were not any values, Jackson explained that "I do not remember anything being there price-wise or cost-wise or value-wise." Jackson stated that after typing the lists and a draft of the antenuptial agreement, the documents were to be sent to Wife's attorney. Jackson added that as

2. These figures represent Husband's assessment offered at trial as to Wife's net worth and income. This was the only proof presented at trial as to the value of Wife's holdings and income.

far as she knew, the documents were either mailed or delivered to Wife's attorney, but Jackson did not undertake that responsibility herself. Sometime thereafter, Jackson received from Wife's attorney the final draft of the Agreement, which had the two lists attached. Jackson notarized the Agreement. Jackson never saw either the Agreement or the lists again.

On cross-examination, Jackson stated that she could not recall the list prepared by Wife containing any debts or liabilities, anything about Wife's income, or anything about income from the businesses. Jackson also explained that Jim Reeves Enterprises was a parent company to several other publishing companies, including Tuckahoe Music, Open Road Music, and Acclaim Music.

The next witness was Husband, who testified that he and Wife were married on May 24, 1969. He and Wife were married for 30½ years when Wife passed away in November of 1999. Husband and Wife eloped approximately eight weeks after they met. Husband stated that he and Wife became engaged 2½ weeks before they eloped.

Husband testified that he signed the Agreement on May 23, which was the day before the wedding. Although Wife was represented by the attorney who drafted the Agreement, Husband was not represented by an attorney. Husband learned one day before he signed the Agreement that Wife wanted such an agreement signed. Husband stated that he wrote out a list of his assets when he was at Wife's attorney's office. Husband identified the handwritten list which he prepared and which was admitted as an exhibit at trial. Husband stated that to his knowledge, his list never was typed. Husband testified that when he entered into the Agreement, his assets were valued at between $25,000 and $30,000. Husband stated that a list of Wife's assets was not prepared in his presence.[3]

Husband testified that he did not know the value or liabilities associated with Wife's house, an office building which Wife owned, the value of her car, or the value of Jim Reeves Enterprises when he signed the Agreement. Husband further stated that he did not know the liabilities associated with Jim Reeves Enterprises or the amount of annual income generated by that business. According to Husband:

Q. Mr. Davis, at the time of execution of the Antenuptial Agreement, did you recognize the name of Tuckahoe Music?

A. When I went to the office, there was a sign out front that had Jim Reeves Enterprises and then it had about three names there which I later found out were names of her publishing companies. I saw them, but it didn't make that much of an impression on me as far as specific names.

Q. What other names were on that—

A. Well, she had three publishing companies at that time, Tuckahoe, Open Road, and Acclaim. . . .

Q. At the time you executed the Antenuptial Agreement, did you know the value of those companies?

A. No.

Q. At the time of execution of the Antenuptial Agreement, did you know what income those companies generated?

A. No.

<hr>

3. When Husband testified that he never saw a list of assets before signing the Agreement, the Trial Court sustained an objection to that testimony based on the parol evidence rule. The Trial Court also sustained the same objection when Husband was asked if he was advised by anyone as to the value of Wife's assets.

Q. At the time of execution of the Antenuptial Agreement, did you know of any RCA contracts that might benefit Mary or any of her companies?

A. I knew Mary had a contract with RCA, but I did not know the value of it.

Q. At the time of execution of the Antenuptial Agreement, were you aware of any real estate that was owned by Mary Reeves in Sumner County?

A. No.

Q. At the time of execution of the Antenuptial Agreement, were you aware that Mary Reeves owned any stock in Cessna Enterprises?

A. No....

Q. At the time of execution of the Antenuptial Agreement, did Mary Reeves ever reveal to you what income she was earning or what income was being earned by any of her companies?

A. No.

Husband candidly acknowledged that he knew prior to the marriage that Wife had substantially more assets than he did, but he added that he did not know the extent of her wealth. After they were married, Husband learned that Wife had annual income of $100,000 from the publishing companies and another $100,000 from the contract with RCA. Husband further stated that when including other royalties as well as income from Jim Reeves Enterprises, Wife's annual income was close to $300,000 to $400,000. Husband added that he did know the value of two lots Wife owned in the Bahamas, and that value was $52,000.

Following the trial, the Trial Court stated, in pertinent part, as follows:

I find that the testimony of Terry Davis and the testimony of Joyce Gray Jackson to be very credible in the sense that they had clear recollections of some things. They were uncertain of some things. Admittedly, there are inconsistencies in some of their testimony, but that's very possible that that's due to the passage of 32 years. It's also very possible that it deals with differing understanding as to what documents they're referring to.... [M]y point is that there are inconsistencies between the testimony of Terry Davis and Joyce Gray Jackson, but I don't find that there's any dishonesty....

The real crux of the issue here is whether there was appropriate disclosure of the financial affairs of the two parties. Full and fair disclosure, I think, is an appropriate legal term that applies....

[I]t is obvious to me that there was a list and that it was in existence prior to the signing of the Agreement. It's also obvious to me that it had some financial information on it and listing of some assets.... Now, how extensive it was, whether it was a full and fair disclosure still remains an important issue.

What I view from all of this is that I'm being asked to infer that the list prepared by Mary Reeves, which was attached to the Agreement which is now misplaced, was unfair and not a full disclosure. I'm not sure I'm permitted to draw that inference just from its absence. I find that both parties were educated people. Both parties had business experience. Both parties were relatively successful, but there was a disparity in wealth clearly based upon Terry Davis' testimony which is unrefuted. Mary Reeves' assets were substantially more than his....

And so I'm, in essence, being asked to infer that the Agreement is incorrect when the Agreement says the parties have attached hereto a general statement of their respective financial conditions and assets which do not purport to

be all inclusive, the values set forth on which do not purport to be necessarily accurate but are rather estimates. I'm being asked to, in essence, infer that that is not a correct statement. And I don't believe I'm permitted to draw that inference and therefore I find that the Agreement is valid. The Agreement is enforceable.

Accordingly, the Trial Court entered an order stating that the Agreement was enforceable, thereby prohibiting Husband from electing against the provisions of the will which provided that Husband would receive $100,000. The Trial Court certified its judgment as a final judgment pursuant to Tenn. R. Civ P. 54.02, and this appeal followed. Husband claims the Trial Court erred when it determined that it had been proven by a preponderance of the evidence that he received a full and fair disclosure of Wife's assets prior to entering into the Agreement. Husband's second issue is his claim that the Trial Court erred when it ruled that the parol evidence rule barred Husband from testifying that Wife never attached a list of her assets to the Agreement, and that he never saw such a list.

### Discussion

The factual findings of the Trial Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R.App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn.2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn.2001).

The Agreement was entered into in 1969, more than a decade before the Tennessee Legislature enacted the statute governing enforcement of antenuptial agreements which is now codified at Tenn. Code Ann. § 36–3–501. This statute provides:

**Enforcement of antenuptial agreements.**—Notwithstanding any other provision of law to the contrary, except as provided in § 36–3–502, any antenuptial or prenuptial agreement entered into by spouses concerning property owned by either spouse before the marriage that is the subject of such agreement shall be binding upon any court having jurisdiction over such spouses and/or such agreement if such agreement is determined, in the discretion of such court, to have been entered into by such spouses freely, knowledgeably and in good faith and without exertion of duress or undue influence upon either spouse. The terms of such agreement shall be enforceable by all remedies available for enforcement of contract terms.

As noted by our Supreme Court in *Randolph v. Randolph*, 937 S.W.2d 815 (Tenn. 1996):

Prior to the statute, at common law, the rule governing the disclosure required to validate antenuptial agreements was announced by the Court of Appeals in *Baker v. Baker*, 24 Tenn.App. 220, 142 S.W.2d 737 (1940). In that case, Mrs. Baker brought suit to set aside an antenuptial contract by which she had waived her statutory right to share in the estate of her deceased husband. She claimed that when the agreement was signed, she did not know her husband was a wealthy man. She asserted that her husband had a duty to disclose that information since the parties were engaged and therefore in a confidential

relationship when the agreement was executed.

The *Baker* court agreed and stated the rule as follows:

The rule supported by the weight of authority may be stated thus: An engagement to marry creates a confidential relation between the contracting parties and an antenuptial contract entered into after the engagement and during its pendency must be attended by the utmost good faith; if the provision for the prospective wife is, in the light of surrounding circumstances, wholly disproportionate to the means of her future husband and to what she would receive under the law, the burden rests on those claiming the validity of the contract to show that there was a full disclosure of the nature, extent and value of the intended husband's property, or that she had full knowledge thereof without such disclosure, and that she, with this knowledge, voluntarily entered into the antenuptial settlement.

It should be noted that under this rule the contract is not invalidated merely because the portion fixed for the bride is small or disproportionate, for, if fully informed and advised, the intended wife may be entirely satisfied with the provision made for her, and, if she then voluntarily enters into the contract she is bound by its terms.

*Id.* at 745–46 (citations omitted).

*Randolph,* 937 S.W.2d at 819, 820.

■ In deciding whether there was any conflict between the rule announced in *Baker* and Tenn.Code Ann. § 36–3–501, the *Randolph* Court concluded there was not, stating:

Initially, this case requires that we resolve ... whether the statute abrogated the rule announced in *Baker* re-

quiring proof of full disclosure or independent knowledge to validate an antenuptial agreement. It is instructive to note that the rule announced in *Baker* remains the prevailing view throughout the country. *See generally* Judith T. Younger, *Perspectives on Antenuptial Agreements: An Update,* 8 J. Am. Acad. Matrim. Law. 1 (1992).... Moreover, ... we do not perceive a conflict between the rule announced in *Baker* and the statute providing for enforcement of antenuptial agreements entered into "knowledgeably." As we interpret the knowledge element of the statute, the spouse seeking to enforce an antenuptial agreement must prove, by a preponderance of the evidence, either that a full and fair disclosure of the nature, extent, and value of his or her holdings was provided to the spouse seeking to avoid the agreement, or that disclosure was unnecessary because the spouse seeking to avoid the agreement had independent knowledge of the full nature, extent, and value of the proponent spouse's holdings. Under the statute, disclosure or full knowledge is required in all cases, not just those which involve an agreement in which the provision for one spouse is wholly disproportionate to the means of the other spouse.

*Randolph,* 937 S.W.2d at 821.

Thus, according to *Randolph,* the requirement that an antenuptial agreement be entered into "knowledgeably" was the same regardless of whether the validity of an antenuptial agreement was controlled by *Baker* or Tenn.Code Ann. § 36–3–501. We also note that a disclosure of assets need not be exact. The *Randolph* Court also observed that "[w]hile disclosure need not reveal precisely every asset owned by an individual spouse, at a minimum, full

and fair disclosure requires that each contracting party be given a clear idea of the nature, extent, and value of the other party's property and resources." *Randolph*, 937 S.W.2d at 821.

■ The question is whether Wife made a full and fair disclosure of the nature, extent, *and* value of her holdings. Assuming that Wife did make a list of her holdings, the Agreement unequivocally states that such a list did "not purport to be all inclusive, the values set forth on which do not purport to be necessarily accurate but rather are estimates." Since Wife's list cannot be located, assuming there was a list, we are unable to determine if that missing list actually was sufficiently detailed such that there was a full and fair disclosure to Husband of Wife's holdings. Nor do we think that the language in the Agreement itself can be interpreted as sufficient proof that the list was a full and fair disclosure when the Agreement specifically states that the list may not be all inclusive and any values set forth may not be accurate. In short, even if we agree with the Trial Court that a list was created, we do not believe the language in the Agreement is in any way sufficient to reasonably conclude that the list contained a full and fair disclosure of Wife's assets when the Agreement states that all assets may not be included and for those assets that are included, their values may not be accurate.

■ Since we do not believe the language in the Agreement standing alone is sufficient proof that there was a full and fair disclosure, we now look at the proof that was offered at trial outside the specific language in the Agreement. Jackson testified that she typed the list and the list identified the house, Jim Reeves Enterprises, some real property, Wife's car and Wife's jewelry. Jackson added, however, that she could not recall there being any values on the list. In a nutshell, Husband testified that there was some property that he did not even know Wife owned, and as to the property that he did know that she owned, he did not know its value save for the property located in the Bahamas that Husband sold to Wife prior to their marriage. Including the language of the Agreement, the proof offered at trial weighs against a conclusion that Wife made a full and fair disclosure of the nature, extent, and value of her holdings to Husband.

■ The next issue is whether Husband had full knowledge of Wife's holdings even without such a disclosure directly being made. There are some of Wife's assets which Husband probably could be charged with having a reasonable knowledge of their value, such as Wife's house and car and perhaps even some of her jewelry. However, the bulk of Wife's assets were of a type that a person cannot simply look at and get a reasonable understanding of its value. For example, while Husband had been to the offices of Jim Reeves Enterprises, there is nothing in the record to indicate that simply being present at the business office could in any way give Husband a means by which to reasonably ascertain its value. This is even more apparent when considering that there were three recording companies being operated by Jim Reeves Enterprises. The same can be said about the RCA contract. Simply because Husband knew it existed does not mean he had any knowledge as to what the contract reasonably was worth. We cannot simply impute this knowledge to Husband, especially when there is no evidence that Wife ever discussed the value of her holdings with Husband at any time before they were married. In addition, Husband testified that he was not even aware of some real property and other assets that were owned by Wife. It is important to note that with regard to Hus-

band's testimony, the Trial Court made a specific credibility determination when stating it found Husband to be credible and that he was not being dishonest.

 The burden of proof was on the heirs and the Administrator of the Estate who were asserting the validity of ante-nuptial agreement. They were required to prove by a preponderance of the evidence that the Agreement was valid because Husband signed the Agreement after being fully and fairly informed of the nature, extent, and value of Wife's holdings. We conclude that the preponderance of the evidence weighs against the Trial Court's finding that this burden was met. We, therefore, reverse the judgment of the Trial Court which found the Agreement valid and enforceable.

Husband's final issue is his claim that the Trial Court erred when it concluded the parol evidence rule barred Husband from testifying that he never saw a list of assets before signing the Agreement and whether he was advised by anyone as to the value of Wife's assets. Due to our holding that even without this testimony, the heirs and Administrator have failed to carry their burden of proof, we pretermit this issue.

■ The only other issue addressed on appeal is a claim by the Administrator that the Dead Man's Statute, Tenn.Code Ann. § 24–1–203 bars Husband's testimony about the transaction at issue. However, the Administrator does not set forth in his brief exactly what testimony he claims should have been barred and why. We, therefore, consider this issue waived.

### Conclusion

The judgment of the Trial Court is reversed, and this cause is remanded to the Trial Court for further proceedings consistent with this Opinion and for collection of the costs below. Costs on appeal are taxed to the Appellees Vergie Reeves Thomas, Louis Reeves McNeese, Joe Lynn Reeves, and Linda Reeves Elliott, and Ames Davis, Administrator C.T.A. of the Estate of Mary Reeves Davis.