# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
July 8, 2014 Session

## CLAUDE R. ELLIS v. MELISA[1] JANE GODFREY ELLIS

**Interlocutory Appeal from the Chancery Court for Bradley County**
**No. 2011-CV-148       Jerri S. Bryant, Chancellor**

---

**No. E2013-02408-COA-R9-CV-FILED-NOVEMBER 25, 2014**

---

The issue on this appeal is whether the parties' prenuptial agreement (the agreement) is valid and enforceable. The trial court held that it was not. The court did so based upon its finding that Claude R. Ellis (Husband) failed to prove that he provided a full and fair disclosure of his assets to Melisa Jane Godfrey Ellis (Wife) before the agreement was executed. The trial court further found (1) that, given the date the draft agreement was furnished to wife, she did not have an opportunity to seek independent counsel for advice; (2) that the agreement was unfair; and (3) that Wife was under duress when the draft was presented to her. Applying the principles set forth by the Supreme Court in **Randolph v. Randolph**, 937 S.W.2d 815 (Tenn. 1996), and its progeny, we affirm the judgment of the trial court.

**Tenn. R. App. P. 9 Interlocutory Appeal by Permission;**
**Judgment of the Chancery Court Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and THOMAS R. FRIERSON, II, JJ., joined.

Donald Capparella, Nashville, Tennessee, and Randall D. Larramore, Chattanooga, Tennessee, for the appellant, Claude R. Ellis.

Martha Meares and E. Leith Marsh, Maryville, Tennessee, for the appellee, Melisa Jane Godfrey Ellis.

---

[1]In documents filed in the trial court, Wife's first name is sometimes spelled "Melissa," but her handwritten signature is "Melisa." Wife is sometimes referred to in the record as "Lisa."

# OPINION

## I.

The parties began dating in February 1995. Wife was then 31 and Husband was 47. Wife had a high school education and had worked in several relatively low-skilled jobs. Husband had a tenth or eleventh grade education, but picked up carpentry and construction-related skills over time, and had started his own company in the early 1980s. When the parties started dating, he owned a construction company called WedgeCorp. He had accumulated substantial wealth. Wife had never been married; Husband had been married twice before, with three children from his prior marriages. According to Wife, the parties got engaged in the spring 1996 and planned to marry in the spring 1997.

In late October 1996, Wife discovered she was pregnant. Shortly thereafter, she moved into Husband's house. Prior to doing so, Wife had always lived with her parents. When she discovered her pregnancy, she quit her job working the night shift at a brake factory. According to Wife, she quit at Husband's insistence because he was concerned about her and the baby's exposure to chemicals at the factory. The parties moved their wedding date up, planning to marry in Las Vegas on December 26, 1996.

Husband called Wife on December 23, three days before the wedding, and asked her to meet him at Hamilton Place Mall. There, he presented her with a wedding ring and, for the first time, a prenuptial agreement. He explained that she could not have the ring without signing the agreement. The parties both testified that Husband made it clear that he would not marry Wife unless she signed the agreement. According to Wife's testimony, which the trial court specifically credited, this was the first time Husband had broached the subject of signing a prenuptial agreement.

After this meeting, Wife called her mother with the news and asked if she knew an attorney with whom she could consult. Wife had no previous dealings with attorneys. Her mother told her the name of a local firm Wife's father had once used. Wife went to the office of the law firm without an appointment. In the lobby of the firm's office, she encountered a man she thought was an attorney. She asked him for advice. He told her that the only reason he was at the office was to drop something off; that he was not a divorce or domestic law attorney; and that she needed to talk to someone who practiced domestic law. This person was not otherwise identified at trial. He did not read the agreement, but told Wife that, in general terms, prenuptial agreements favored the person for whom they were written rather than the other party. He further told her that she would not be able to find or consult with an attorney before Christmas. This encounter occurred on the day before Christmas Eve.

The parties met the next day at another law office and executed the agreement. Wife testified that she did not want to sign it, and told Husband so, but that, under the circumstances, she felt she had no other choice. The agreement provides, in pertinent part, as follows:

> 1. Separate Property: The interest of [Husband] in the Motion Industries Building, the Ocoee River Transport Building, the WedgeCorp Office Building, a House and 6 acres located at 5771 Bates Pike, Cleveland, Tennessee and any interest he may have in Wed[g]ecorp Construction Co. shall remain his separate property, and he shall keep and retain sole ownership, control and enjoyment of this property as his separate property, free and clear of any claim of [Wife]. The parties recognize that this separate property may be increased by reason of earnings, investments, inheritance or other means. This property owned by [Husband], at the time of their marriage, shall remain his separate property.
>
> 2. Earnings: All wages, earnings and accumulations resulting from personal services of, or any other source attributable to either party, which were acquired before the marriage, shall remain the separate property of such party.
>
> All wages, earnings and accumulations resulting from personal services of, or any other source attributable to either party, which are acquired during the marriage, shall be considered marital property and treated as such.
>
> 3. Acquisitions, Income and Replacements: All property not specifically mentioned elsewhere in this Agreement and acquired by either party before or during the marriage, by gift, inheritance, purchase or otherwise, together with all replacements to any separate property, all income and distributions from any such property, and all appreciation thereof, shall be considered the separate property of the party acquiring such property or in whose name the property is placed.
>
> All property acquired during the marriage in both parties' names shall be considered marital property and treated as such.

* * *

5. Full Disclosure: Each party acknowledges that the other has made full disclosure of his or her property, means and resources and the estimated value of said property, and that he or she is entering into this Agreement freely, voluntarily and with full knowledge. Attached to this Agreement as Exhibit A is a list of the property owned by each party at the time this agreement was entered into.

6. Treatment of Separate Property: As provided herein, [Wife] hereby waives, releases and relinquishes any and all claims and rights of every kind, nature or description that she may acquire by reason of the marriage in the property listed in Exhibit A, which was owned by [Husband] prior to this marriage, the appreciation thereof, or estate, under the present and future laws of the State of Tennessee[.]

* * *

7. Execution of Documents Waiving Interest in Retirement Plans. Each party agrees to execute a valid waiver of any claim to any benefits under any retirement or pension plans in which the other party is a participant, including, but not limited to, a waiver of any survivorship annuity or any other survivorship benefits. . . .
[T]his waiver shall extend to any pension benefits under any retirement plan created after the marriage of the parties.

* * *

9. Dissolution of Marriage: In the event of the dissolution of the marriage by divorce, . . .
(a) No claim shall be made by [Wife] to the property listed in the attached Exhibit A.

(Underlining in original.) The attached Exhibit A listed two assets belonging to Wife and sixteen assets belonging to Husband. Only one of Husband's assets was listed with an estimated value, as will be further discussed herein. The parties flew to Las Vegas on Christmas day of 1996, and were married there on December 26.

-4-

Husband filed for divorce on June 24, 2011. In her answer, Wife alleged that the agreement was invalid because it "was not entered into by [her] freely, knowledgeably, and in good faith as she executed [it] under the exertion of duress or undue influence of the [Husband]." The trial court granted Husband's motion to bifurcate the hearing for the purpose of determining whether the agreement was valid. After considering the evidence presented at the bifurcated hearing – consisting of the testimony of Husband and Wife – the trial court found that Wife's credibility outweighed Husband's regarding "the circumstances surrounding the prenuptial agreement." The trial court held that the agreement was invalid, stating, in pertinent part, as follows:

> The facts presented in this case do not show that there was full disclosure. There is no proof that she got independent advice. She was not as sophisticated as Mr. Ellis and the agreement appears to be unfair.
>
> There was little opportunity to get independent advice because of the lateness, which I find was on December the 23rd, 1996, and that also the circumstances surrounding the lateness, the time in December when this was disclosed to her, her pregnancy, I find that those did create some duress in dealing with this agreement. The duty was on Mr. Ellis to disclose and not upon her to ask.
>
> *       *       *
>
> Here the property was not accurately listed. The values were not shown. Whether this duress was unlawful as required by the law, I haven't been provided any current definitions on that, but I find that the antenuptial agreement will be set aside. She had no real opportunity to review it.

The trial court and this Court granted Husband's motion for an interlocutory appeal pursuant to Tenn. R. App. P. 9.

As we stated in our order granting interlocutory review, the sole issue on appeal is whether the parties' premarital agreement is valid and enforceable.

II.

In this non-jury case, our standard of review is de novo upon the record of the

-5-

proceedings below; however, the record comes to us with a presumption of correctness as to the trial court's factual determinations, a presumption we must honor unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995). There is no presumption of correctness as to the trial court's legal conclusions. *Kendrick v. Shoemake*, 90 S.W.3d 566, 569 (Tenn. 2002); *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996). "Where the issue for decision depends on the determination of the credibility of witnesses, the trial court is the best judge of the credibility and its findings of credibility are entitled to great weight. This is true because the trial court alone has the opportunity to observe the appearance and the demeanor of the witnesses." *Tenn-Tex Properties v. Brownell Electro, Inc.*, 778 S.W.2d 423, 426 (Tenn. 1989).

III.

Prenuptial agreements, sometimes called antenuptial or premarital agreements, are favored by Tennessee law. *Perkinson v. Perkinson*, 802 S.W.2d 600, 601 (Tenn. 1990); *Wilson v. Moore*, 929 S.W.2d 367, 370 (Tenn. Ct. App. 1996). As a general rule, Tennessee courts enforce a prenuptial agreement if the party seeking enforcement demonstrates that the agreement was entered into freely, knowledgeably, and in good faith and without the exertion of duress or undue influence. *Randolph*, 937 S.W.2d at 819; *Estate of Baker v. King*, 207 S.W.3d 254, 266-67 (Tenn. Ct. App. 2006). Tenn. Code Ann. § 36-3-501 (2014) provides that,

> [n]otwithstanding any other provision of law to the contrary, except as provided in § 36-3-502, any antenuptial or prenuptial agreement entered into by spouses concerning property owned by either spouse before the marriage that is the subject of such agreement shall be binding upon any court having jurisdiction over such spouses and/or such agreement if such agreement is determined, in the discretion of such court, to have been entered into by such spouses freely, knowledgeably and in good faith and without exertion of duress or undue influence upon either spouse. The terms of such agreement shall be enforceable by all remedies available for enforcement of contract terms.

Wife contends that she did not enter into the agreement freely and knowledgeably, and that she was under duress resulting from the circumstances surrounding the presentation and execution of the agreement. In *Randolph*, the seminal case examining whether a spouse has "knowledgeably" entered into a prenuptial agreement, the Supreme Court stated:

> We interpret the statutory requirement that an antenuptial

agreement is enforceable only if entered into "knowledgeably" to mean that the spouse seeking to enforce an antenuptial agreement must prove, by a preponderance of the evidence, either that a full and fair disclosure of the nature, extent and value of his or her holdings was provided to the spouse seeking to avoid the agreement, or that disclosure was unnecessary because the spouse seeking to avoid the agreement had independent knowledge of the full nature, extent, and value of the proponent spouse's holdings.

937 S.W.2d at 817. The requirement of a "full and fair disclosure of the nature, extent and value" of a proponent spouse's holdings must satisfy the following principles enumerated in *Randolph*: (1) "an agreement to marry gives rise to a confidential relationship," and therefore the parties "do not deal at arms' length and must exercise candor and good faith in all matters bearing upon the contract"; (2) "parties to an antenuptial agreement are very often ill-matched in terms of bargaining power," and the disclosure requirement provides a measure of fairness to the party in the weaker position; and (3) because "the State has an interest and is a party to every marriage . . . it is altogether appropriate that parties entering into antenuptial agreements do so with knowledge of the holdings to which they are waiving any claim under state law." *Id.* at 821.

*Randolph* makes clear that whether a proponent spouse has satisfied the disclosure requirement is heavily dependent upon the particular facts and circumstances presented:

> The extent of what constitutes "full and fair" disclosure varies from case to case depending upon a number of factors, including the relative sophistication of the parties, the apparent fairness or unfairness of the substantive terms of the agreement, and any other circumstance unique to the litigants and their specific situation. While disclosure need not reveal precisely every asset owned by an individual spouse, at a minimum, full and fair disclosure requires that each contracting party be given a clear idea of the nature, extent, and value of the other party's property and resources. Though not required, a fairly simple and effective method of proving disclosure is to attach a net worth schedule of assets, liabilities, and income to the agreement itself.

*Id.* at 821 (internal citations omitted); *see also* ***Erickson v. Erickson-Mitchell***, No. M2006-00895-COA-R3-CV, 2007 WL 1555824 at *3 (Tenn. Ct. App. M.S., filed May 29, 2007) ("The adequacy of the disclosure depends on the context in which the disclosure is

provided"); ***Boote v. Shivers***, 198 S.W.3d 732, 745 (Tenn. Ct. App. 2005) ("Determining whether the prerequisites to the enforceability of an antenuptial agreement have been met requires an examination of the totality of the circumstances surrounding the negotiation and execution of the agreement."); ***In re Estate of Belew***, No. 03A01-9807-CH-00206, 1998 WL 881863 at *4 (Tenn. Ct. App. E.S., filed Dec. 17, 1998) ("Tennessee courts which have considered the full and fair disclosure issue have uniformly determined it to be factually driven.").

Tennessee courts have observed that a comprehensive and precise list of assets and liabilities, or "detailed disclosures such as financial statements, appraisals, balance sheets, or the like," ***Erickson***, 2007 WL 1555824 at *3, are not necessarily required to uphold a prenuptial agreement. ***Randolph***, 937 S.W.2d at 821 ("disclosure need not reveal precisely every asset owned by an individual spouse"); ***In re Estate of Davis***, 213 S.W.3d 288, 296 (Tenn. Ct. App. 2006) ("a disclosure of assets need not be exact"); ***Lowe v. Lowe***, No. E2000-01456-COA-R3-CV, 2001 WL 579050 at *2 (Tenn. Ct. App. E.S., filed May 30, 2001); ***Estate of Belew***, 1998 WL 881863 at *4 ("specific appraisal values for assets are not required to sustain the validity of an antenuptial agreement"). Furthermore, "[t]he inadvertent failure to disclose an asset or the unintentional undervaluation of an asset will not invalidate a prenuptial agreement as long as the disclosure that was made provides an essentially accurate understanding of the party's financial holdings." ***Erickson***, 2007 WL 1555824 at *3 (internal quotation marks omitted); ***Reece v. Elliott***, 208 S.W.3d 419, 422 (Tenn. Ct. App. 2006) ("[t]he fact that there was no value listed for one particular asset, even though it was significant, would not invalidate the agreement that [the wife] entered freely."); ***Wilson***, 929 S.W.2d at 372 (the "inadvertent omission of two assets whose value comprised ten to fifteen percent of the total value of [the husband's] holdings was not material or significant enough to prevent the enforcement of the prenuptial agreement.").

In cases where the proponent spouse fails to demonstrate that he or she met the statutory requirement of "full and fair" disclosure of the "nature, extent, and value" of his or her property and holdings, however, Tennessee appellate courts have invalidated the agreement. *See* ***Randolph***, 937 S.W.2d at 822 (invalidating agreement where, among other things, the husband "did not at anytime reveal to [wife] the extent or value of his holdings" and wife "was aware only of the nature of his business [and] had only general knowledge of his holdings"); ***Estate of Davis***, 213 S.W.3d at 297 (reversing trial court's judgment upholding agreement and holding that where asset list prepared by proponent wife did not include values and stated that "all assets may not be included," wife failed to prove full and fair disclosure); ***Sattler v. Sattler***, No. M2007-02319-COA-R3-CV, 2008 WL 4613589 at *4 (Tenn. Ct. App. M.S., filed Oct. 13, 2008) (where "the parties never fully disclosed their assets, liabilities, and income" and "[a] schedule of their assets, liabilities, and income was not provided," agreement was invalid); ***Williams v. Kuykendall***, No. 03A01-9705-CV-

00167, 1997 WL 671925 at *4 (Tenn. Ct. App. E.S., filed Oct. 29, 1997) (affirming invalidation of agreement where there was "no showing that [wife] was fully apprised of the amount of [husband's] pension, the value of his property, indebtedness owed, bank accounts, and such").

In the present case, the trial court, after seeing and hearing the parties testify, found that "the facts presented in this case do not show that there was full disclosure." The court further observed that Wife "was not as sophisticated" in business and financial matters as was Husband. The evidence does not preponderate against these findings. Wife had essentially no experience, education, or training in financial or business matters. She had lived with her parents up until the point she discovered she was pregnant. She was working a factory job on the night shift at that time. Husband, sixteen years Wife's elder, conversely had a great deal of business acumen and experience, having started and built a multi-million dollar construction company. He demonstrated himself to be a shrewd and savvy businessman. Where one party's sophistication in financial matters heavily outweighs that of the other, our appellate courts have applied this fact as a factor supporting the invalidation of a prenuptial agreement. *See Randolph*, 937 S.W.2d at 822 (noting husband was "a learned businessman very shrewd in his dealings" and wife "possessed no prior business experience or knowledge"); *Stancil v. Stancil*, No. E2011-00099-COA-R3-CV, 2012 WL 112600 at *5 (Tenn. Ct. App. E.S., filed Jan. 13, 2012) ("Here, Wife clearly was disadvantaged with respect to sophistication").

The agreement in this case provides that Wife "hereby waives, releases and relinquishes any and all claims and rights of every kind, nature or description that she may acquire by reason of the marriage in the property listed in Exhibit A." The asset list attached to the agreement as exhibit A states as follows: "Property owned by [Wife]: (1) Cherry bedroom suite; (2) 1990 Nissan Sentra; No cash or accounts." Exhibit A lists 16 assets as "Property owned by [Husband]." Only one of the assets has a listed value – "WedgeCorp working capital" is valued at $143,000. At the hearing, Husband was cross-examined regarding his answers to a propounded interrogatory requesting him to estimate the value of the assets listed on exhibit A at the time of execution of the agreement. In his testimony at the hearing, Husband provided valuations for the following assets:[2]

| | |
|---|---|
| Motion Industries Building | $ 500,000 |
| Ocoee River Transport Building | 1,000,000 |
| WedgeCorp Office Building | 150,000 |
| House, 6 acres | 555,000 |
| Aircraft Hangar | 50,000 |

[2]There was no mention of any debt.

| | |
|---|---|
| 1993 Corvette | 42,000 |
| WedgeCorp equipment, vehicles and office supplies | 1,600,000 |
| WedgeCorp working capital | 143,000 |
| Household furnishings and guns | 75,000 |
| Horses and related items | 40,000 |
| Interest in WedgeCorp | 1,500,000 |
| Total | $5,655,000 |

Husband was not asked about the value of other assets listed on exhibit A: his 1973 PA-140 airplane, 1993 Jeep, Harley-Davidson motorcycle, and two Sea Doo jet skis. Exhibit A informed Wife of the estimated value of a single item out of Husband's list of sixteen assets, which item accounted for only approximately 2.5% of Husband's apparent net worth. The value of the remainder of the 97.5% was not disclosed. The evidence does not preponderate against the trial court's judgment that Husband failed to meet his burden of proving that he made a full and fair disclosure of the nature, extent, and value of his holdings.

Husband argues that, even if he failed to make a full disclosure, Wife had independent knowledge of his holdings because they dated over a year before their marriage and Wife was familiar with assets such as his house and his airplane. On the "independent knowledge" principle, **Randolph** instructs as follows:

> In the absence of full and fair disclosure, an antenuptial agreement will still be enforced if the spouse seeking to avoid the agreement had independent knowledge of the full nature, extent, and value of the other spouse's property and holdings. Of course, the particular facts and circumstances of each case govern, to a great degree, the determination of knowledge. Some factors relevant to the assessment include, but are not limited to, the parties' respective sophistication and experience in business affairs, the duration of the relationship prior to the execution of the agreement, the time of the signing of the agreement in relation to the time of the wedding, and the parties' representation by, or opportunity to consult with, independent counsel.

937 S.W.2d at 822. Where a proponent spouse's assets are visible and easily comprehensible, and it is shown that the other spouse could clearly see the full extent, nature, and value of the holdings, this Court has upheld a prenuptial agreement. *See In re Estate of Geary*, No. M2011-01705-COA-R3-CV, 2012 WL 642657 at *5 (Tenn. Ct. App. M.S., filed

Feb. 28, 2012) (affirming "the trial court's factual findings, which indicate that Widow knew the nature and extent of Decedent's business holdings and had the opportunity to learn more prior to signing the prenuptial agreement"); *In re Estate of Cooper*, No. M2009-01290-COA-R3-CV, 2010 WL 844778 at *5 (Tenn. Ct. App. M.S., filed Mar. 9, 2010) (upholding agreement where "the only property owned by [husband] both at the time of the marriage and at the time of his death is the house and the 18 to 20 acres of land, property that [wife] clearly knew about"). Conversely, we have invalidated prenuptial agreements when the extent and value of the proponent spouse's assets were not easily comprehensible or ascertainable. *See Randolph*, 937 S.W.2d at 822 (wife "only had general knowledge of [husband's] holdings"); *Estate of Baker*, 207 S.W.3d at 268 (wife unaware that husband owned a rental house, and did not know value of his gas station and other assets at time of agreement); *Estate of Davis*, 213 S.W.3d at 297 ("the bulk of Wife's assets were of a type that a person cannot simply look at and get a reasonable understanding of its value . . . there is nothing in the record to indicate that simply being present at the business office could in any way give Husband a means by which to reasonably ascertain its value"); *Sattler*, 2008 WL 4613589 at *4 ("To the extent there was a limited disclosure of [wife's] assets, liabilities and income, . . . the record fails to establish that the casual dinner conversations provided [husband] with a full and fair understanding of her financial world").

In the present case, wife was familiar with husband's house and six acres, had taken vacations with husband and flown in his airplane, and generally knew his spending habits. Wife testified that husband appeared to be a successful businessman. She further testified as follows:

> Q: You didn't have any idea about how much this man was worth, did you?
>
> A: No, ma'am.
>
> Q: And you had no idea about the values of these assets, did you?
>
> A: No.
>
> Q: Did you really know the difference between a corporation and a partnership? Did you really understand that?
>
> A: No.
>
> Q: Did you really understand a building versus a piece of real

property?

A: No.

Q: Did you have any idea about the debts, whether he had any debts or no debts?

A: No.

Husband presented no evidence suggesting that Wife knew, or had a reasonable opportunity to ascertain, the values of the following assets: the Motion Industries building ($500,000); the Ocoee River Transport building ($1,000,000); the WedgeCorp office building ($150,000); WedgeCorp equipment, vehicles and office supplies ($1,600,000); and Husband's "interest in WedgeCorp" ($1,500,000). Husband failed to reveal these holdings that were valued, in his estimation, at a total of $4,750,000. The evidence does not preponderate against the trial court's determination that Wife did not have independent knowledge of the full nature, extent, and value of Husband's property and holdings.

Moreover, the other circumstances surrounding the execution of the agreement, particularly the timing of Husband's presentation of it to Wife, weigh in favor of the trial court's judgment invalidating the agreement. In this case, Wife had no reasonable opportunity to consult with independent counsel, despite her best efforts, under the circumstances, to do so. In cases addressing the issue of the validity of a prenuptial agreement, whether the spouse opposing the agreement was represented by, or had opportunity to consult with, independent counsel, is very often a significant factor. *Randolph*, 937 S.W.2d at 822 (wife "had no opportunity to personally study the agreement or to seek advice from her own attorney"); *Stancil*, 2012 WL 112600 at *5 (wife was "lacking independent counsel"); *Estate of Davis*, 213 S.W.3d at 291; *Reece*, 208 S.W.3d at 422-23; *Estate of Baker*, 207 S.W.3d at 270 ("Wife was not represented by independent counsel, nor was it proven that Wife was given an opportunity to consult with independent counsel"); *Boote*, 198 S.W.3d at 741 ("While the participation of independent counsel representing each party is not the sine qua non of enforceability, it provides the best assurance that the legal prerequisites will be met and that the antenuptial agreement will be found enforceable in the future."). In *Randolph*, the High Court observed that although representation by independent counsel is not "an absolute requirement," it "may be the best evidence that a party has entered into an antenuptial agreement voluntarily and knowledgeably." 937 S.W.2d at 822.

Furthermore, *Randolph* observed that "the time of the signing of the agreement in relation to the time of the wedding" is a pertinent factor to be considered. *Id.* The *Randolph*

Court considered it significant that the husband first presented the prenuptial agreement to the wife one day before the wedding. *Id.* at 818, 822; *see also* **Stancil**, 2012 WL 112600 at *5 (invalidating agreement where "Wife, wishing to go ahead with getting married, was rushed into signing an antenuptial agreement which lacks values for Husband's listed assets"); **Estate of Cooper**, 2010 WL 844778 at *3 (upholding agreement where the opponent spouse "candidly testified that the antenuptial agreement was not 'sprung upon her' and that there had been many discussions about the antenuptial agreement"); **Sattler**, 2008 WL 4613589 at *5 (invalidating agreement where "[a]lthough the document was signed several months prior to the wedding, . . . [husband] signed it immediately without the benefit of assistance of counsel"); **Estate of Davis**, 213 S.W.3d at 290-91 (invalidating agreement where, among other things, "[t]wo days before the wedding, Husband was told that he needed to sign an antenuptial agreement").

In the present case, Husband surprised Wife with his presentation of the agreement three days before the scheduled wedding, and, significantly, *two days before Christmas*. When Wife got the agreement, she called her mother asking where she could find an attorney, and drove to a local law office without an appointment. In the lobby, she encountered an unidentified man that she assumed was an attorney, who, without reading the agreement, gave her some practical advice that was undoubtably both discouraging and generally accurate: (1) that prenuptial agreements are generally written in favor of those who propound them; (2) that she needed the legal counsel of a domestic law attorney; and (3) that she was not going to be able to find and consult with such a lawyer before December 26. These statements hardly qualify as "independent legal advice." Under the totality of the circumstances, we agree with the trial court's determination that the factors regarding "the time of the signing of the agreement in relation to the time of the wedding, and the parties' representation by, or opportunity to consult with, independent counsel," **Randolph**, 937 S.W.2d at 822, weigh in favor of invalidating the agreement.

The trial court further found that Wife executed the agreement under duress, a finding Husband challenges on appeal. We agree with Husband on this point.

Tenn. Code Ann. § 36-3-501 provides that a prenuptial agreement is binding "if such agreement is determined, in the discretion of such court, to have been entered into by such spouses *freely*, knowledgeably and in good faith *and without exertion of duress* or undue influence upon either spouse." (Emphasis added.) Thus, the plain language of the statute requires that the agreement be entered into both "freely" and "without exertion of duress." As pertinent to the question of whether Husband met his burden of proof of showing the agreement was entered into by Wife freely and without duress, Wife testified as follows:

> Q: Now, when you were presented this agreement, you knew

-13-

that if you didn't sign this agreement he did not want to marry you; correct?

A: Yes. When he g[a]ve me the agreement on the 23rd, he said I had to sign it or we would not get married.

*     *     *

A: [He gave] it to me on the 23rd and there was nothing open on the 23rd. I couldn't find an attorney to help me with – with that and I didn't understand it. And I asked him why he hadn't given it to me before and he said that his attorney had just advised him that he needed to give that to me. I was upset about – I mean, the 23rd. We were getting married on the 26th.

*     *     *

Q: So it wasn't that big of a deal, is it? Two weeks and you can set up a Vegas wedding, can't you?

A: That's not what he said. He told me it was either then or nothing.

*     *     *

Q: Did you ask him for additional time on the 24th to think about this agreement and look it over a little bit more closely?

A: I told him I didn't want to. He knew I didn't want to sign it.

Q: Did you ask –

A: He – and I told him why I didn't want to sign it. I said, if I had had time to get an attorney to go really over it with me, that would have been one thing, but not on the 23rd.

*     *     *

Q: And do you agree that is your signature and you signed it[?]

A: Yes, sir.

* * *

Q: Why did you sign it, then?

A: I signed this because I felt like I had no choice.

* * *

Q: And they asked you, they said, Mrs. Ellis, did you read this and did you understand it, didn't they?

A: They did not ask – all they asked – they didn't read anything about it.  They just said do the both – do you two understand what you are signing, and I answered – we both answered yes.

Q: Okay.  So they asked you if you had read and understood what you were signing?

A: They asked if we understood what we were signing.

Q: Okay.  And you told them yes?

A: Yes.

Q: Why did you lie to these people?

A: Because I felt like I had no choice.

Q: You had no choice because you wanted to marry Claude Ellis, correct, and that created the no choice scenario that you're objecting to, right?

A: Because I was three months pregnant.

Q: Suppose you didn't.  What's going to happen to you? Suppose you didn't marry him. Would your life have changed in any particular way?

-15-

A: Yes, it would have. I didn't have a job at that point, three months pregnant. Yes, my life would have changed.

There are relatively few Tennessee cases addressing the concept of "duress" as it relates to the enforceability of a prenuptial agreement. In **Boote**, this Court observed that "[d]uress consists of unlawful restraint, intimidation, or compulsion that is so severe that it overcomes the mind or will of ordinary persons." 198 S.W.3d at 745. We found no duress where the proponent husband awakened the wife in her hospital bed shortly after her surgery and asked her to sign the prenuptial agreement "[d]espite the fact that [she] still had several medications in her system." *Id.* at 737. However, there were several other significant factors weighing in favor of upholding the agreement in **Boote**. As we noted:

> Ms. Boote was represented by independent legal counsel throughout the process. Her attorney had a draft of the antenuptial agreement six weeks before the wedding, and he went over it with her line by line in his office three weeks before the wedding. At that point, she was sitting in her own attorney's office and was presumably able to speak freely and voice any reservations she might have had about entering into the antenuptial agreement. . . . To this day, Ms. Boote does not claim that she was unwilling to sign the antenuptial agreement or that she would have refused to sign it had she been personally presented with Mr. Boote's financial disclosure statement sooner.

198 S.W.3d at 746.

In **Williams**, we held that the sole "fact the antenuptial agreement did not recite that [wife] was pregnant is an insufficient ground for setting it aside when this fact was known to both parties." 1997 WL 671925 at *3. However, we invalidated the agreement after considering the totality of the circumstances, including our recognition that the wife "was concerned that the child be legitimate, and that she would not be turned out of [husband's] house without being able to employ the rights accorded a wife." *Id.* at *4. Other appellate decisions have considered the pressure placed on a party to sign a prenuptial agreement as part of the general consideration of the totality of the circumstances. *See, e.g., Randolph*, 937 S.W.2d at 818 ("[wife] said her only choices had been to sign the agreement or be kicked out of the residence she and her son had shared with [husband] for the previous year.").

In this case, Wife had recently moved in with Husband after discovering that she was three months pregnant, having lived at home with her parents her entire life prior to this.

Wife was also recently unemployed – at Husband's insistence, according to her testimony. The plans for the wedding had been made, plane tickets and a wedding dress purchased, and reservations made. Obviously, Wife was given very little time for reflection or consideration. Moreover, Wife wanted to marry Husband. It would demonstrate a certain lack of empathy not to recognize that Wife was under a great deal of pressure to sign the agreement. Nevertheless, we agree with Husband that the legal definition of "duress" is rather stringent, *see* **Boote**, 198 S.W.3d at 745, and we do not base our ruling on a finding of duress. We do consider, however, Wife's unenviable position as part of the "totality of the circumstances" analysis, as other courts have, and we believe it has a bearing on the question of whether Wife "freely" entered into the agreement, as Tenn. Code Ann. § 36-3-501 requires.

The trial court's ruling was based on its factual findings, which in turn rested in large part on its observations of the parties during their testimony at the hearing. *See* **Estate of Geary**, 2012 WL 642657 at *5 (observing that "[t]he trial court heard Widow's testimony that she did not know the dollar value of Decedent's business assets, and the trial court's findings reflect the credibility and weight the court afforded to Widow's testimony concerning her knowledge"); **Preston v. Preston**, No. 01A01-9806-CH-00289, 1999 WL 824292 at *4 (Tenn. Ct. App. W.S., filed Aug. 12, 1999) ("Considering the trial court's implicit determination of the parties' credibility on this issue, the evidence does not preponderate against the trial court's conclusion that the "knowledge" component of the statute was not met and that the prenuptial agreement was therefore invalid and unenforceable."). In the case now before us, the evidence does not preponderate against the trial court's ruling that the agreement is invalid and unenforceable.

IV.

The judgment of the trial court is affirmed. Costs on appeal are assessed to the appellant, Claude R. Ellis. The case is remanded to the trial court, pursuant to applicable law, for further proceedings.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE

-17-